**Stanton T. Mathews & Associates**
            **A Law Corp.**
24012 Calle de la Plata Suite 320
 Laguna Hills, California 92653
(949) 586-2235 Fax (949) 586-1806

Stanton T. Mathews    Bar No. 99058
mathews@mathewsfirm.com
Andrew J. Nissen      Bar No. 284313
nissen@mathewsfirm.com

Attorneys for Plaintiff, JOSEPH HARRIS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH HARRIS,<br><br>                    Plaintiff,<br><br>vs.<br><br>SAN MANUEL BAND OF MISSION INDIANS, SAN MANUEL INDIAN BINGO AND CASINO, and DOES 1 through 10, inclusive,<br><br>                    Defendants. | CASE NO.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**1.    WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (TAMENY CLAIM)**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION

1.    Plaintiff JOSEPH HARRIS is and at all times relevant hereto, is and has been an individual citizen and resident of the State of California, County of San Bernardino.

2.      Plaintiff is informed and believes and thereupon alleges that at all times mentioned herein Defendant SAN MANUEL BAND OF MISSION INDIANS a federally-recognized sovereign Indian tribe (hereafter "Tribe"), and the State of California, a sovereign State of the United States (hereafter "State"), pursuant to the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, codified at 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) (hereafter "IGRA"), and any successor statute or amendments.

3.      Pursuant to the Tribal-State Gaming Compact of 1999, [see Exhibit 1] as amended in Section 10.2(d), Defendants, and each of them, waived their right to assert sovereign immunity in connection with Plaintiff's claim.  The Tribe must maintain a commercial general liability insurance policy.

"The Tribe shall waive its right to assert sovereign immunity up to the limits of the Policy in accordance with the tribal ordinance referenced in subdivision (d)(ii) of the Tribal-State Gaming Compact in connection with any claim for personal injury arising out of, connected with, or relating to the operation of the Gaming Facility, including, but not limited to, injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility."

[see Exhibit 2]

4.     Pursuant to the Tribal-State Gaming Compact of 1999, as amended between the State of California and the San Manuel Band of Mission Indians, in Section 10.2(d)(i),

"The Tribe shall, in the exercise of its sovereignty, waive its right to assert its sovereign immunity in connection with United States District Court where the Tribe's Gaming Facility is located and the Ninth Circuit Court of Appeals (and any successor court), or, if the federal court declines to hear the action, in any action brought in the courts of the State of California that are located in San Bernardino County, including courts of appeal, to (1) enforce the parties' obligation to arbitrate, (2) confirm, correct, modify, or vacate the arbitral award rendered in the arbitration, or (3) enforce or execute a judgment based upon the award. The Tribe agrees not to assert, and will waive, any defense alleging improper venue or forum non conveniens as to such state courts."

[see Exhibit 2]

5.     As required by Tribal-State Gaming Compact of 1999, as amended between the State of California and the San Manuel Band of Mission Indians, in Section 10.2(d)(i)(D), Plaintiff did first exhaust the Tribe's administrative remedies for resolving the claim.

6.      Following the termination of Plaintiff JOSEPH HARRIS on or about February 16, 2013 Plaintiff's counsel attempted various and numerous times to meet and confer in good faith regarding the facts alleged herein.  Defendants, and each of them, ignored and later denied such efforts.  Defendants, and each of them categorically refused disclosure of investigative documentation including but not limited to video surveillance, investigative reports, or witness statements. Defendants, and each of them claimed immunity against all claims by Plaintiff and asserted that there is no forum for Plaintiff's complaint to be heard, whether Federal, State, or Tribal jurisdiction.

## INTRODUCTION

7.      This is a claim against Defendants SAN MANUEL BAND OF MISSION INDIANS, SAN MANUEL INDIAN BINGO AND CASINO, and DOES 1 through 10, inclusive for the wrongful termination of Plaintiff JOSEPH HARRIS in violation of public policy.  Plaintiff was wrongfully terminated in violation of public policy for reporting and/or complaining of drug use by co-workers and reporting and/or complaining of sexual harassment in the workplace at the San Manuel Indian Bingo and Casino.

## THE PARTIES

8.     Plaintiff, JOSEPH HARRIS, is an individual employed by Defendants, and each of them, on or about April 17, 2012 and terminated on or about February 16, 2013.  Defendants are SAN MANUEL BAND OF MISSION INDIANS, a federally-recognized sovereign Indian tribe and SAN MANUEL INDIAN BINGO AND CASINO wherein the Tribe is the beneficial owner of and exercises jurisdiction over the San Manuel Indian Reservation, and the San Manuel Indian Bingo and Casino, and DOES 1 through 10, inclusive.

## GENERAL ALLEGATIONS

9.     At all times mentioned herein, and at the time the causes of action arose, Plaintiff was an individual and resident of the State of California. Plaintiff is employed and does business in the State of California.

10.     The acts giving rise to Plaintiff's claims occurred upon the premises of Defendant employer SAN MANUEL INDIAN BINGO AND CASINO and on the San Manuel Indian Reservation wherein the Tribe is the beneficial owner of and exercises jurisdiction over the San Manuel Indian Reservation, and the San Manuel Indian Bingo and Casino.

11.     Plaintiff is informed and believes and thereupon alleges that at all times mentioned herein Defendant SAN MANUEL INDIAN BINGO AND

CASINO is a "Gaming Employer" located within the external boundaries of the State of California, County of San Bernardino, and is within the scope of and defined by the IGRA of 1988 (P.L. 100-497, 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) any amendments thereto, and all regulations promulgated thereunder.

12.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants, DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names and will ask leave of Court to amend this Complaint to show their true names and capacities when the same are ascertained.

13.     Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to, and legally caused injury and damages proximately thereby to Plaintiff as herein alleged.

14.     Collectively, Defendant SAN MANUEL BAND OF MISSION INDIANS, Defendant SAN MANUEL INDIAN BINGO AND CASINO, and DOES 1-10 will be referred to as "Defendants."

15.     Plaintiff is informed and believes, and on such information and belief, alleges that Defendants, SAN MANUEL BAND OF MISSION INDIANS,

Defendant SAN MANUEL INDIAN BINGO AND CASINO and DOES 1 through 10, and each of them, are corporations, partnerships or associations and/or gaming casinos offering Class III gaming activities on their land, employers, and/or offices, business entities, form unknown, organized and existing under partnerships or associations and/or business entities, form unknown, organized and existing, and authorized to and doing business under the laws of the United States Federal government, State of California, between the State of California and the San Manuel Band of Mission Indians, and/or San Manuel Band of Mission Indians Tribal law.

16.     At all times mentioned in this Complaint, said Defendants owed a duty to Plaintiff to uphold a strong public policy derived from statutory authority against sexual harassment, retaliation, and sex discrimination. There is strong public policy derived from statutory authority in favor of individuals who engage in whistle-blowing activities and report violations of statutes of public importance. The violations and wrongful conduct described above are matters of public importance and relate to statutes, rules, and regulations enacted in the United States, the State of California, between the State of California and the San Manuel Band of Mission Indians, and/or San Manuel Band of Mission Indians Tribal law.

17.     At all times mentioned in this Complaint, said Defendants owed a duty to Plaintiff to uphold a fundamental and substantial public policy pursuant to

California and Federal constitution, statutes, regulations, and common law,

including but not limited to the California Constitution including, but not limited

to, article I, section 10, Cal- OSHA including, but not limited to, California Labor

Code sections 142.3, 923, 1102.5, 6305, 6306, 6310, 6311, 6312, 6400, 6402,

6403, 6404, 6405, 6406, 6408 et seq., California Health and Safety Statutes

including, but not limited to, California Health and Safety Code sections

11054,11350,11351,11352.1,11357, 11359 11360, 11364, 11365,

11366.5,11377,11550 et. seq., California Penal Code sections 422 et. seq.,

prohibits an employee from being terminated or adversely affected for reporting

and/or complaining of drug use within the company, including the use of

Marijuana, reporting and/or complaining of smoking in the facility, reporting

and/or complaining of dangers to the employee's own and other people's health,

safety and welfare, reporting and/or complaining to a government entity of dangers

to the employee's own and other people's health, safety and welfare and reporting

and/or complaining of criminal threats and threats of assault and battery.

18.     Plaintiff is informed and believes, and on such information and belief,

alleges that Defendants, SAN MANUEL BAND OF MISSION INDIANS,

Defendant SAN MANUEL INDIAN BINGO AND CASINO and DOES 1 through

10, and each of them, are employers subject to the same duty to employees to

adopt and comply with standards no less stringent than federal workplace and occupational health, employment, and safety standards.

19.     Plaintiff is informed and believes, and on such information and belief, alleges that Defendants, SAN MANUEL BAND OF MISSION INDIANS, Defendant SAN MANUEL INDIAN BINGO AND CASINO and DOES 1 through 10, and each of them, are employers subject to the same duty to employees to adopt and comply with standards no less stringent than federal laws and state laws forbidding employers generally from discriminating in the employment of persons to work for the Gaming Operation or in the Gaming Facility.

20.     At all times herein mentioned, Defendants, whether specifically identified or designated herein as a DOE, and each of them, were the agents, and/or employees, and/or servants, and/or partners, and/or joint venturers and participants with all other Defendants, and with each other, and in doing the things hereinafter mentioned, were acting in the capacity of agents, employees, servants, partners, and each of them.

21.     That Plaintiff properly exhausted all administrative remedies as required under the Tribal-State Gaming Compact of 1999, [attached hereto see Exhibit 1] as amended between the State of California and the San Manuel Band of Mission Indians, in Section 10.2(d)(i)(D),  [attached hereto see Exhibit 2] pursuant

to the IGRA of 1988 (P.L. 100-497, codified at 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.), entitling Plaintiff's instant suit in federal district court.

22.    The conduct which the Plaintiff complains of in this Complaint, and which is alleged below, was carried out by the Defendants, and all of them, willfully, intentionally, and with oppression, malice, and fraud, and was carried out with conscious disregard of Plaintiff JOSEPH HARRIS's rights guaranteed by Federal, State, and Tribal law, pursuant to which Plaintiff is entitled to an award of exemplary damages according to proof.

23.    Plaintiff JOSEPH HARRIS began working for Defendants, and all of them, at the San Manuel Indian Bingo and Casino on or about April 17, 2012.

24.    Plaintiff JOSEPH HARRIS was employed as a security guard on and around the casino and gaming operations of the San Manuel Indian Bingo and Casino.

25.    During the course of his employment, Plaintiff JOSEPH HARRIS complained of and reported instances of sexual harassment in the workplace to his supervisors.

26.    During the course of his employment, Plaintiff JOSEPH HARRIS, based on good faith, reasonable, and articulable personal observations, complained of and reported suspected drug use by an employee of the San Manuel Indian Bingo and Casino.

27.     On or about February 16, 2013, Plaintiff JOSPEH HARRIS was terminated from his position as a safety officer with the San Manuel Indian Bingo and Casino.

28.     At all times, Plaintiff JOSEPH HARRIS was an exemplary employee whose performance was outstanding and he was a dedicated and loyal employee.

## FIRST CAUSE OF ACTION

## (WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY)

29.     Plaintiff hereby realleges and incorporates by this reference paragraphs 1 through 28 of the Complaint, as if fully set forth herein.

Common Law provides Discrimination and Retaliation in employment is:

1. A public policy;

2. Conduct by the employer in violation of public policy, such as termination or other adverse employment action because of a) race, national origin, color, sex, or sexual orientation, or b) in retaliation for an employee's participation in legally protected activity or refusal to commit an illegal act; and

3. Damages resulting from the adverse employment action.

Tameny v. Atlantic Richfield Co. (1980) 27 Cal. 3d 167, 174 and 178.

30.     The misconduct of defendants constitutes Discrimination and Retaliation in employment and is actionable under the Common Law.

31.     A fundamental and substantial public policy pursuant to the California and Federal Constitutions, statutes, regulations, and common law, including but not limited to the California Constitution including, but not limited to, Article I, Section 10, Cal - OSHA including, but not limited to, California Labor Code sections 142.3, 923, 1102.5, 6305, 6306, 6310, 6311, 6312, 6400, 6402, 6403, 6404, 6405, 6406, 6408 et seq., California Health and Safety Statutes including, but not limited to, California Health and Safety Code sections 11054, 11350, 11351, 11352.1, 11357, 11359, 11360, 11364, 11365, 11366.5, 11377, 11550 et. seq., California Penal Code sections 422 et. seq., prohibits an employee from being terminated or adversely affected for reporting and/or complaining of drug use within the company, including but not limited to the use of Marijuana, reporting and/or complaining of smoking in the facility, reporting and/or complaining of dangers to the employee's own and other people's health, safety and welfare, reporting and/or complaining to a government entity of dangers to the employee's own and other people's health, safety and welfare and reporting and/or complaining of criminal threats and threats of assault and battery.

32.     There is a strong public policy derived from statutory authority against sexual harassment, retaliation, and sex discrimination. There is strong

public policy derived from statutory authority in favor of individuals who engage in whistle-blowing activities and report violations of statutes of public importance. The violations and wrongful conduct described above are matters of public importance and relate to statutes, rules, and regulations.

33.     Taking adverse action, including discharge and demotion, against an employee engaged in the aforementioned protected activity is against public policy.

34.     Plaintiff JOSEPH HARRIS was engaged in protected activity when Plaintiff reported and/or complained of drug use within the company, and but not limited to reported and/or complained of dangers to the employee's own and other people's health, safety and welfare.

35.     Defendants, and each of them, knew, perceived, and/or believed that plaintiff JOSEPH HARRIS was engaged in the aforementioned protected activity.

36.     At all times mentioned in this Complaint, Plaintiff JOSEPH HARRIS performed work competently for Defendants, and each of them.

37.     Defendants, and each of them, made decisions adverse to the Plaintiff JOSEPH HARRIS in regards to investigation of claims, and conditions and privileges of employment. Defendants, and each of them, terminated Plaintiff JOSEPH HARRIS.

38.     Plaintiff JOSEPH HARRIS' protected activity, as described hereinabove, was a motivating factor in Defendants', and each of them, aforementioned decisions that were adverse to Plaintiff in regards to compensation and terms, conditions and privileges of employment. The Plaintiff JOSEPH HARRIS' protected activity, as described hereinabove, was a motivating factor in Defendants aforementioned decision to actually terminate the Plaintiff JOSEPH HARRIS.

39.     As a direct, legal, and proximate cause of Plaintiff's aforementioned protected status activity, described hereinabove, Defendants, and each of them, terminated Plaintiff JOSEPH HARRIS in violation of public policy.

40.     As a direct, foreseeable, and proximate result of Defendants', and each of them, conduct, as alleged above, Plaintiff JOSEPH HARRIS has suffered lost income, employment, and career opportunities, and has suffered and continues to suffer other economic loss in an amount according to proof to be shown at trial.

41.     As a direct, foreseeable and proximate result of Defendants, and each of them, conduct, as alleged above, Plaintiff JOSEPH HARRIS has suffered and continues to suffer great anxiety, embarrassment, anger loss of enjoyment of life, and severe emotional distress, the precise amount of which will be proven at trial.

42.     The conduct which Plaintiff JOSEPH HARRIS complains of in this Complaint, and which is alleged above, was carried out by the Defendants, and

each of them, willfully, intentionally, and with oppression, malice and fraud and was carried out with conscious disregard of Plaintiff's rights as and as such Plaintiff JOSEPH HARRIS is entitled to an award of exemplary damages according to proof. The aforementioned conducted on which punitive damages is alleged, as described hereinabove, was done with the advance knowledge by an officer, director and/or managing agent of Defendants, and each of them, of the unfitness of the employee and the employee was employed with a conscious disregard of the rights and/or safety or others. The aforementioned conducted on which punitive damages is alleged, as described hereinabove, was authorized, ratified and/or committed by an officer, director, and/or managing agent of Defendants, and each of them.

43.    As further direct, legal and proximate result of Defendants', and each of them, conduct, Plaintiff JOSEPH HARRIS was caused to and did employ the services of counsel to prosecute this action, and is accordingly entitled to an award of attorneys' fees according to proof.

**WHEREFORE, PLAINTIFF** prays for judgment against Defendants, and each of them, as follows:

### UNDER THE FIRST CAUSE OF ACTION

1. For lost wages and related employment benefits according to proof at trial;

2. For special damages according to proof at trial;

3. For attorneys' fees according to proof;

4. For punitive damages according to proof at trial;

5. For general damages, and for damages for emotional distress according to proof a trial;

6. The costs of litigation; and

7. Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

DATED:      November 17, 2014        STANTON T. MATHEWS
                                     & ASSOCIATES, *A LAW CORP.*

                              By:    _____
                                     ANDREW J. NISSEN, Attorneys for
                                     Plaintiff, JOSEPH HARRIS

# EXHIBIT 1

# TRIBAL-STATE GAMING COMPACT

## Between the *1, a federally recognized Indian Tribe,
## and the
## STATE OF CALIFORNIA

This Tribal-State Gaming Compact is entered into on a government-to-government basis by and between the *1, a federally-recognized sovereign Indian tribe (hereafter "Tribe"), and the State of California, a sovereign State of the United States (hereafter "State"), pursuant to the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, codified at 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) (hereafter "IGRA"), and any successor statute or amendments.

PREAMBLE

A. In 1988, Congress enacted IGRA as the federal statute governing Indian gaming in the United States. The purposes of IGRA are to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; to provide a statutory basis for regulation of Indian gaming adequate to shield it from organized crime and other corrupting influences; to ensure that the Indian tribe is the primary beneficiary of the gaming operation; to ensure that gaming is conducted fairly and honestly by both the operator and players; and to declare that the establishment of an independent federal regulatory authority for gaming on Indian lands, federal standards for gaming on Indian lands, and a National Indian Gaming Commission are necessary to meet congressional concerns.

B. The system of regulation of Indian gaming fashioned by Congress in IGRA rests on an allocation of regulatory jurisdiction among the three sovereigns involved: the federal government, the state in which a tribe has land, and the tribe itself. IGRA makes Class III gaming activities lawful on the lands of federally-recognized Indian tribes only if such activities are: (1) authorized by a tribal ordinance, (2) located in a state that permits such gaming for any purpose by any person, organization or entity, and (3) conducted in conformity with a gaming compact entered into between the Indian tribe and the state and approved by the Secretary of the Interior.

C-1. The Tribe is currently operating a tribal gaming casino offering Class III gaming activities on its land. On September 1, 1999, the largest number of Gaming Devices operated by the Tribe was *2.

C-2. [ALTERNATE PARAGRAPH] The Tribe does not currently operate a gaming facility that offers Class III gaming activities. However, on or after the effective date of

this Compact, the Tribe intends to develop and operate a gaming facility offering Class III gaming activities on its reservation land, which is located in *3 County of California.

D. The State enters into this Compact out of respect for the sovereignty of the Tribe; in recognition of the historical fact that Indian gaming has become the single largest revenue-producing activity for Indian tribes in the United States; out of a desire to terminate pending "bad faith" litigation between the Tribe and the State; to initiate a new era of tribal-state cooperation in areas of mutual concern; out of a respect for the sentiment of the voters of California who, in approving Proposition 5, expressed their belief that the forms of gaming authorized herein should be allowed; and in anticipation of voter approval of SCA 11 as passed by the California legislature.

E. The exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California. The parties are mindful that this unique environment is of great economic value to the Tribe and the fact that income from Gaming Devices represents a substantial portion of the tribes' gaming revenues. In consideration for the exclusive rights enjoyed by the tribes, and in further consideration for the State's willingness to enter into this Compact, the tribes have agreed to provide to the State, on a sovereign-to-sovereign basis, a portion of its revenue from Gaming Devices.

F. The State has a legitimate interest in promoting the purposes of IGRA for all federally-recognized Indian tribes in California, whether gaming or non-gaming. The State contends that it has an equally legitimate sovereign interest in regulating the growth of Class III gaming activities in California. The Tribe and the State share a joint sovereign interest in ensuring that tribal gaming activities are free from criminal and other undesirable elements.

Section 1.0. PURPOSES AND OBJECTIVES.

The terms of this Gaming Compact are designed and intended to:

(a) Evidence the goodwill and cooperation of the Tribe and State in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the parties.

(b) Develop and implement a means of regulating Class III gaming, and only Class III gaming, on the Tribe's Indian lands to ensure its fair and honest operation in accordance with IGRA, and through that regulated Class III gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs.

(c) Promote ethical practices in conjunction with that gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the

Tribe's Gaming Operation and protecting against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming.

Sec. 2.0. DEFINITIONS.

Sec. 2.1. "Applicant" means an individual or entity that applies for a Tribal license or State certification.

Sec. 2.2. "Association" means an association of California tribal and state gaming regulators, the membership of which comprises up to two representatives from each tribal gaming agency of those tribes with whom the State has a gaming compact under IGRA, and up to two delegates each from the state Division of Gambling Control and the state Gambling Control Commission.

Sec. 2.3. "Class III gaming" means the forms of Class III gaming defined as such in 25 U.S.C. Sec. 2703(8) and by regulations of the National Indian Gaming Commission.

Sec. 2.4. "Gaming Activities" means the Class III gaming activities authorized under this Gaming Compact.

Sec. 2.5. "Gaming Compact" or "Compact" means this compact.

Sec. 2.6. "Gaming Device" means a slot machine, including an electronic, electromechanical, electrical, or video device that, for consideration, permits: individual play with or against that device or the participation in any electronic, electromechanical, electrical, or video system to which that device is connected; the playing of games thereon or therewith, including, but not limited to, the playing of facsimiles of games of chance or skill; the possible delivery of, or entitlement by the player to, a prize or something of value as a result of the application of an element of chance; and a method for viewing the outcome, prize won, and other information regarding the playing of games thereon or therewith.

Sec. 2.7. "Gaming Employee" means any person who (a) operates, maintains, repairs, assists in any Class III gaming activity, or is in any way responsible for supervising such gaming activities or persons who conduct, operate, account for, or supervise any such gaming activity, (b) is in a category under federal or tribal gaming law requiring licensing, (c) is an employee of the Tribal Gaming Agency with access to confidential information, or (d) is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public.

Sec. 2.8. "Gaming Facility" or "Facility" means any building in which Class III gaming activities or gaming operations occur, or in which the business records, receipts, or other funds of the gaming operation are maintained (but excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, buildings,

and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation, provided that nothing herein prevents the conduct of Class II gaming (as defined under IGRA) therein.

Sec. 2.9. "Gaming Operation" means the business enterprise that offers and operates Class III Gaming Activities, whether exclusively or otherwise.

Sec. 2.10. "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Class III Gaming Activities on the Tribe's Indian lands and approved under IGRA.

Sec. 2.11. "Gaming Resources" means any goods or services provided or used in connection with Class III Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, gambling devices and ancillary equipment, implements of gaming activities such as playing cards and dice, furniture designed primarily for Class III gaming activities, maintenance or security equipment and services, and Class III gaming consulting services. "Gaming Resources" does not include professional accounting and legal services.

Sec. 2.12. "Gaming Resource Supplier" means any person or entity who, directly or indirectly, manufactures, distributes, supplies, vends, leases, or otherwise purveys Gaming Resources to the Gaming Operation or Gaming Facility, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if the purveyor is not otherwise a Gaming Resource Supplier as described by of Section 6.4.5, the compensation received by the purveyor is not grossly disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gambling Operation.

Sec. 2.13. "IGRA" means the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) any amendments thereto, and all regulations promulgated thereunder.

Sec. 2.14. "Management Contractor" means any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

Sec. 2.15. "Net Win" means "net win" as defined by American Institute of Certified Public Accountants.

Sec. 2.16. "NIGC" means the National Indian Gaming Commission.

Sec. 2.17. "State" means the State of California or an authorized official or agency thereof.

Sec. 2.18. "State Gaming Agency" means the entities authorized to investigate, approve, and regulate gaming licenses pursuant to the Gambling Control Act (Chapter 5 (commencing with Section 19800) of Division 8 of the Business and Professions Code).

Sec. 2.19. "Tribal Chairperson" means the person duly elected or selected under the Tribe's organic documents, customs, or traditions to serve as the primary spokesperson for the Tribe.

Sec. 2.20. "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill those functions by the National Indian Gaming Commission, as primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribal Gaming Ordinance. No person employed in, or in connection with, the management, supervision, or conduct of any gaming activity may be a member or employee of the Tribal Gaming Agency.

Sec. 2.21. "Tribe" means the Dry Creek Rancheria, a federally-recognized Indian tribe, or an authorized official or agency thereof.

Sec. 3.0 CLASS III GAMING AUTHORIZED AND PERMITTED. The Tribe is hereby authorized and permitted to engage in only the Class III Gaming Activities expressly referred to in Section 4.0 and shall not engage in Class III gaming that is not expressly authorized in that Section.

Sec. 4.0. SCOPE OF CLASS III GAMING.

Sec. 4.1. Authorized and Permitted Class III gaming. The Tribe is hereby authorized and permitted to operate the following Gaming Activities under the terms and conditions set forth in this Gaming Compact:

(a) The operation of Gaming Devices.

(b) Any banking or percentage card game.

(c) The operation of any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state are permitted to do so under state and federal law.

(e) Nothing herein shall be construed to preclude negotiation of a separate compact governing the conduct of off-track wagering at the Tribe's Gaming Facility.

Sec. 4.2. Authorized Gaming Facilities. The Tribe may establish and operate not more than two Gaming Facilities, and only on those Indian lands on which gaming may lawfully be conducted under the Indian Gaming Regulatory Act. The Tribe may combine and operate in each Gaming Facility any forms and kinds of gaming permitted under law.

except to the extent limited under IGRA, this Compact, or the Tribe's Gaming Ordinance.

Sec. 4.3. Sec. 4.3. Authorized number of Gaming Devices

Sec. 4.3.1 The Tribe may operate no more Gaming Devices than the larger of the following:

(a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or

(b) Three hundred fifty (350) Gaming Devices.

Sec. 4.3.2. Revenue Sharing with Non-Gaming Tribes.

(a) For the purposes of this Section 4.3.2 and Section 5.0, the following definitions apply:

(i) A "Compact Tribe" is a tribe having a compact with the State that authorizes the Gaming Activities authorized by this Compact. Federally-recognized tribes that are operating fewer than 350 Gaming Devices are "Non-Compact Tribes." Non-Compact Tribes shall be deemed third party beneficiaries of this and other compacts identical in all material respects. A Compact Tribe that becomes a Non-Compact Tribe may not thereafter return to the status of a Compact Tribe for a period of two years becoming a Non-Compact Tribe.

(ii) The Revenue Sharing Trust Fund is a fund created by the Legislature and administered by the California Gambling Control Commission, as Trustee, for the receipt, deposit, and distribution of monies paid pursuant to this Section 4.3.2.

(iii) The Special Distribution Fund is a fund created by the Legislature for the receipt, deposit, and distribution of monies paid pursuant to Section 5.0.

Sec. 4.3.2.1. Revenue Sharing Trust Fund.

(a) The Tribe agrees with all other Compact Tribes that are parties to compacts having this Section 4.3.2, that each Non-Compact Tribe in the State shall receive the sum of $1.1 million per year. In the event there are insufficient monies in the Revenue Sharing Trust Fund to pay $1.1 million per year to each Non-Compact Tribe, any available monies in that Fund shall be distributed to Non-Compact Tribes in equal shares. Monies in excess of the amount necessary to $1.1 million to each Non-Compact Tribe shall remain in the Revenue Sharing Trust Fund available for disbursement in future years.

(b) Payments made to Non-Compact Tribes shall be made quarterly and in equal shares out of the Revenue Sharing Trust Fund. The Commission shall serve as the trustee of the fund. The Commission shall have no discretion with respect to the use or disbursement of the trust funds. Its sole authority shall be to serve as a depository of the trust funds and to disburse them on a quarterly basis to Non-Compact Tribes. In no event shall the State's

General Fund be obligated to make up any shortfall or pay any unpaid claims.

Sec. 4.3.2.2. Allocation of Licenses.

(a) The Tribe, along with all other Compact Tribes, may acquire licenses to use Gaming Devices in excess of the number they are authorized to use under Sec. 4.3.1, but in no event may the Tribe operate more than 2,000 Gaming Devices, on the following terms, conditions, and priorities:

(1). The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

(2) The Tribe may acquire and maintain a license to operate a Gaming Device by paying into the Revenue Sharing Trust Fund, on a quarterly basis, in the following amounts:

| Number of Licensed Devices | Fee Per Device Per Annum |
| --- | --- |
| 1-350 | $0 |
| 351-750 | $900 |
| 751-1250 | $1950 |
| 1251-2000 | $4350 |

(3) Licenses to use Gaming Devices shall be awarded as follows:

(i) First, Compact Tribes with no Existing Devices (i.e., the number of Gaming Devices operated by a Compact Tribe as of September 1, 1999) may draw up to 150 licenses for a total of 500 Gaming Devices;

(ii) Next, Compact Tribes authorized under Section 4.3.1 to operate up to and including 500 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (i)), may draw up to an additional 500 licenses, to a total of 1000 Gaming Devices;

(iii) Next, Compact Tribes operating between 501 and 1000 Gaming Devices as of

September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (ii)), shall be entitled to draw up to an additional 750 Gaming Devices;

(iv) Next, Compact Tribes authorized to operate up to and including 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iii)), shall be entitled to draw up to an additional 500 licenses, for a total authorization to operate up to 2000 gaming devices.

(v) Next, Compact Tribes authorized to operate more than 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iv))., shall be entitled to draw additional licenses up to a total authorization to operate up to 2000 gaming devices.

(vi). After the first round of draws, a second and subsequent round(s) shall be conducted utilizing the same order of priority as set forth above. Rounds shall continue until tribes cease making draws, at which time draws will be discontinued for one month or until the Trustee is notified that a tribe desires to acquire a license, whichever last occurs.

(e) As a condition of acquiring licenses to operate Gaming Devices, a non-refundable one-time pre-payment fee shall be required in the amount of $1,250 per Gaming Device being licensed, which fees shall be deposited in the Revenue Sharing Trust Fund. The license for any Gaming Device shall be canceled if the Gaming Device authorized by the license is not in commercial operation within twelve months of issuance of the license.

Sec. 4.3.2.3. The Tribe shall not conduct any Gaming Activity authorized by this Compact if the Tribe is more than two quarterly contributions in arrears in its license fee payments to the Revenue Sharing Trust Fund.

Sec. 4.3.3. If requested to do so by either party after March 7, 2003, but not later than March 31, 2003, the parties will promptly commence negotiations in good faith with the Tribe concerning any matters encompassed by Sections 4.3.1 and Section 4.3.2, and their subsections.

SEC. 5.0 REVENUE DISTRIBUTION

Sec. 5.1. (a) The Tribe shall make contributions to the Special Distribution Fund created by the Legislature, in accordance with the following schedule, but only with respect to the number of Gaming Devices operated by the Tribe on September 1, 1999:

| Number of Terminals in Quarterly Device Base | Percent of Average Gaming Device Net Win |
|---|---|
| 1 - 200 | 0% |
| 201 – 500 | 7% |

| 501 – 1000 | 7% applied to the excess over 200 terminals, up to 500 terminals, plus 10% applied to terminals over 500 terminals, up to 1000 terminals. |
|---|---|
| 1000+ | 7% applied to excess over 200, up to 500 terminals, plus 10% applied to terminals over 500, up to 1000 terminals, plus 13% applied to the excess above 1000 terminals. |

(b) The first transfer to the Special Distribution Fund of its share of the gaming revenue shall made at the conclusion of the first calendar quarter following the second anniversary date of the effective date of this Compact.

Sec. 5.2. Use of funds. The State's share of the Gaming Device revenue shall be placed in the Special Distribution Fund, available for appropriation by the Legislature for the following purposes: (a) grants, including any administrative costs, for programs designed to address gambling addiction; (b) grants, including any administrative costs, for the support of state and local government agencies impacted by tribal government gaming; (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the Compact; (d) payment of shortfalls that may occur in the Revenue Sharing Trust Fund; and (e) any other purposes specified by the Legislature. It is the intent of the parties that Compact Tribes will be consulted in the process of identifying purposes for grants made to local governments.

Sec. 5.3. (a) The quarterly contributions due under Section 5.1 shall be determined and made not later than the thirtieth (30th) day following the end of each calendar quarter by first determining the total number of all Gaming Devices operated by a Tribe during a given quarter ("Quarterly Device Base"). The "Average Device Net Win" is calculated by dividing the total Net Win from all terminals during the quarter by the Quarterly Terminal Base.

(b) Any quarterly contribution not paid on or before the date on which such amount is due shall be deemed overdue. If any quarterly contribution under Section 5.1 is overdue to the

Special Distribution Fund, the Tribe shall pay to the Special Distribution Fund, in addition to the overdue quarterly contribution, interest on such amount from the date the quarterly contribution was due until the date such quarterly contribution (together with interest thereon) was actually paid at the rate of 1.0% per month or the maximum rate permitted by state law, whichever is less. Entitlement to such interest shall be in addition to any other remedies the State may have.

(c) At the time each quarterly contribution is made, the Tribe shall submit to the State a report (the "Quarterly Contribution Report") certified by an authorized representative of the Tribe reflecting the Quarterly Device Base, the Net Win from all terminals in the Quarterly Device Base (broken down by Gaming Device), and the Average Device Net Win.

(d) If the State causes an audit to be made pursuant to subdivision (c), and the Average Device Net Win for any quarter as reflected on such quarter's Quarterly Contribution Reports is found to be understated, the State will promptly notify the Tribe, and the Tribe will either accept the difference or provide a reconciliation satisfactory to the State. If the Tribe accepts the difference or does not provide a reconciliation satisfactory to the State, the Tribe must immediately pay the amount of the resulting deficiencies in the quarterly contribution plus interest on such amounts from the date they were due at the rate of 1.0% per month or the maximum rate permitted by applicable law, whichever is less.

(e) The Tribe shall not conduct Class III gaming if more than two quarterly contributions to the Special Distribution Fund are overdue.

Sec. 6.0. LICENSING.

Sec. 6.1. Gaming Ordinance and Regulations. All Gaming Activities conducted under this Gaming Compact shall, at a minimum, comply with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, and with all rules, regulations, procedures, specifications, and standards duly adopted by the Tribal Gaming Agency.

Sec. 6.2. Tribal Ownership, Management, and Control of Gaming Operation. The Gaming Operations authorized under this Gaming Compact shall be owned solely by the Tribe.

Sec. 6.3. Prohibition Regarding Minors. (a) Except as provided in subdivision (b), the Tribe shall not permit persons under the age of 18 years to be present in any room in which Class III Gaming Activities are being conducted unless the person is en-route to a non-gaming area of the Gaming Facility.

(b) If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe shall prohibit persons under the age of 21 years from being present in any area in which Class III gaming activities are being conducted and in which alcoholic beverages may be consumed, to the extent required by the state Department of Alcoholic

Beverage Control.

Sec. 6.4. Licensing Requirements and Procedures.

Sec. 6.4.1. Summary of Licensing Principles. All persons in any way connected with the Gaming Operation or Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under this Gaming Compact, including, but not limited to, all Gaming Employees and Gaming Resource Suppliers, and any other person having a significant influence over the Gaming Operation must be licensed by the Tribal Gaming Agency. The parties intend that the licensing process provided for in this Gaming Compact shall involve joint cooperation between the Tribal Gaming Agency and the State Gaming Agency, as more particularly described herein.

Sec. 6.4.2. Gaming Facility. (a) The Gaming Facility authorized by this Gaming Compact shall be licensed by the Tribal Gaming Agency in conformity with the requirements of this Gaming Compact, the Tribal Gaming Ordinance, and IGRA. The license shall be reviewed and renewed, if appropriate, every two years thereafter. Verification that this requirement has been met shall be provided by the Tribe to the State Gaming Agency every two years. The Tribal Gaming Agency's certification to that effect shall be posted in a conspicuous and public place in the Gaming Facility at all times.

(b) In order to protect the health and safety of all Gaming Facility patrons, guests, and employees, all Gaming Facilities of the Tribe constructed after the effective date of this Gaming Compact, and all expansions or modifications to a Gaming Facility in operation as of the effective date of this Compact, shall meet the building and safety codes of the Tribe, which, as a condition for engaging in that construction, expansion, modification, or renovation, shall amend its existing building and safety codes if necessary, or enact such codes if there are none, so that they meet the standards of either the building and safety codes of any county within the boundaries of which the site of the Facility is located, or the Uniform Building Codes, including all uniform fire, plumbing, electrical, mechanical, and related codes then in effect provided that nothing herein shall be deemed to confer jurisdiction upon any county or the State with respect to any reference to such building and safety codes. Any such construction, expansion or modification will also comply with the federal Americans with Disabilities Act, P.L. 101-336, as amended, 42 U.S.C. § 12101 et seq.

(c) Any Gaming Facility in which gaming authorized by this Gaming Compact is conducted shall be issued a certificate of occupancy by the Tribal Gaming Agency prior to occupancy if it was not used for any Gaming Activities under IGRA prior to the effective date of this Gaming Compact, or, if it was so used, within one year thereafter. The issuance of this certificate shall be reviewed for continuing compliance every two years thereafter. Inspections by qualified building and safety experts shall be conducted under the direction of the Tribal Gaming Agency as the basis for issuing any certificate hereunder. The Tribal Gaming Agency shall determine and certify that, as to new construction or new use for gaming, the Facility meets the Tribe's building and safety

code, or, as to facilities or portions of facilities that were used for the Tribe's Gaming Activities prior to this Gaming Compact, that the facility or portions thereof do not endanger the health or safety of occupants or the integrity of the Gaming Operation. The Tribe will not offer Class III gaming in a Facility that is constructed or maintained in a manner that endangers the health or safety of occupants or the integrity of the gaming operation.

(d) The State shall designate an agent or agents to be given reasonable notice of each inspection by the Tribal Gaming Agency's experts, which state agents may accompany any such inspection. The Tribe agrees to correct any Gaming Facility condition noted in an inspection that does not meet the standards set forth in subdivisions (b) and (c). The Tribal Gaming Agency and the State's designated agent or agents shall exchange any reports of an inspection within 10 days after completion of the report, which reports shall also be separately and simultaneously forwarded by both agencies to the Tribal Chairperson. Upon certification by the Tribal Gaming Agency's experts that a Gaming Facility meets applicable standards, the Tribal Gaming Agency shall forward the experts' certification to the State within 10 days of issuance. If the State's agent objects to that certification, the Tribe shall make a good faith effort to address the State's concerns, but if the State does not withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of Section 9.0.

Sec. 6.4.3. Suitability Standard Regarding Gaming Licenses. (a) In reviewing an application for a gaming license, and in addition to any standards set forth in the Tribal Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license will undermine public trust that the Tribe's Gaming Operations, or tribal government gaming generally, are free from criminal and dishonest elements and would be conducted honestly. A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the applicant is all of the following, in addition to any other criteria in IGRA or the Tribal Gaming Ordinance:

(a) A person of good character, honesty, and integrity.

(b) A person whose prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gambling, or in the carrying on of the business and financial arrangements incidental thereto.

(c) A person who is in all other respects qualified to be licensed as provided in this Gaming Compact, IGRA, the Tribal Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe. An applicant shall not be found to be unsuitable solely on the ground that the applicant was an employee of a tribal gaming operation in California that was conducted prior to the effective date of this Compact.

Sec. 6.4.4. Gaming Employees. (a) Every Gaming Employee shall obtain, and thereafter

maintain current, a valid tribal gaming license, which shall be subject to biennial renewal; provided that in accordance with Section 6.4.9, those persons may be employed on a temporary or conditional basis pending completion of the licensing process.

(b) Except as provided in subdivisions (c) and (d), the Tribe will not employ or continue to employ, any person whose application to the State Gaming Agency for a determination of suitability, or for a renewal of such a determination, has been denied or has expired without renewal.

(c) Notwithstanding subdivision (a), the Tribe may retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if: (i) the person holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially; (ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability; (iii) the person is not an employee or agent of any other gaming operation; and (iv) the person has been in the continuous employ of the Tribe for at least three years prior to the effective date of this Compact.

(d) Notwithstanding subdivision (a), the Tribe may employ or retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if the person is an enrolled member of the Tribe, as defined in this subdivision, and if (i) the person holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially; (ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability; and (iii) the person is not an employee or agent of any other gaming operation. For purposes of this subdivision, "enrolled member" means a person who is either (a) certified by the Tribe as having been a member of the Tribe for at least five (5) years, or (b) a holder of confirmation of membership issued by the Bureau of Indian Affairs.

(e) Nothing herein shall be construed to relieve any person of the obligation to apply for a renewal of a determination of suitability as required by Section 6.5.6.

Sec. 6.4.5. Gaming Resource Supplier. Any Gaming Resource Supplier who, directly or indirectly, provides, has provided, or is deemed likely to provide at least twenty-five thousand dollars ($25,000) in Gaming Resources in any 12-month period, or who has received at least twenty-five thousand dollars ($25,000) in any consecutive 12-month period within the 24-month period immediately preceding application, shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any such Gaming Resources to or in connection with the Tribe's Operation or Facility. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Supplier to update all information provided in the previous application.

For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of Gaming Resources with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. Any agreement between the Tribe and a Gaming Resource Supplier shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or non-renewal of the Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.

Sec. 6.4.6. Financial Sources. Any person extending financing, directly or indirectly, to the Tribe's Gaming Facility or Gaming Operation shall be licensed by the Tribal Gaming Agency prior to extending that financing, provided that any person who is extending financing at the time of the execution of this Compact shall be licensed by the Tribal Gaming Agency within ninety (90) days of such execution. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the previous application. For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. Any agreement between the Tribe and a Financial Source shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination, upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of financing with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. A Gaming Resource Supplier who provides financing exclusively in connection with the sale or lease of Gaming Resources obtained from that Supplier may be licensed solely in accordance with licensing procedures applicable, if at all, to Gaming Resource Suppliers. The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this section, financing provided by a federally regulated or state-regulated bank, savings and loan, or other federally- or state-regulated lending institution; or any agency of the federal, state, or local government; or any investor who, alone or in conjunction with others, holds less than 10% of any outstanding indebtedness evidenced by bonds issued by the Tribe.

Sec. 6.4.7. Processing Tribal Gaming License Applications. Each applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency. At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including Section 556.4 of Title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees. For applicants who are

business entities, these licensing provisions shall apply to the entity as well as: (i) each of its officers and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager; (iii) each of its owners or partners, if an unincorporated business; (iv) each of its shareholders who owns more than 10 percent of the shares of the corporation, if a corporation; and (v) each person or entity (other than a financial institution that the Tribal Gaming Agency has determined does not require a license under the preceding section) that, alone or in combination with others, has provided financing in connection with any gaming authorized under this Gaming Compact, if that person or entity provided more than 10 percent of (a) the start-up capital, (b) the operating capital over a 12-month period, or (c) a combination thereof. For purposes of this Section, where there is any commonality of the characteristics identified in clauses (i) to (v), inclusive, between any two or more entities, those entities may be deemed to be a single entity. Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

Sec. 6.4.8. Background Investigations of Applicants. The Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the applicant is qualified for a gaming license under the standards set forth in Section 6.4.3, and to fulfill all requirements for licensing under IGRA, the Tribal Gaming Ordinance, and this Gaming Compact. The Tribal Gaming Agency shall not issue other than a temporary license until a determination is made that those qualifications have been met. In lieu of completing its own background investigation, and to the extent that doing so does not conflict with or violate IGRA or the Tribal Gaming Ordinance, the Tribal Gaming Agency may contract with the State Gaming Agency for the conduct of background investigations, may rely on a state certification of non-objection previously issued under a gaming compact involving another tribe, or may rely on a State gaming license previously issued to the applicant, to fulfill some or all of the Tribal Gaming Agency's background investigation obligation. An applicant for a tribal gaming license shall be required to provide releases to the State Gaming Agency to make available to the Tribal Gaming Agency background information regarding the applicant. The State Gaming Agency shall cooperate in furnishing to the Tribal Gaming Agency that information, unless doing so would violate any agreement the State Gaming Agency has with a source of the information other than the applicant, or would impair or impede a criminal investigation, or unless the Tribal Gaming Agency cannot provide sufficient safeguards to assure the State Gaming Agency that the information will remain confidential or that provision of the information would violate state or federal law. If the Tribe adopts an ordinance confirming that Article 6 (commencing with section 11140) of Chapter 1 of Title 1 of Part 4 of the California Penal Code is applicable to members, investigators, and staff of the Tribal Gaming Agency, and those members, investigators, and staff thereafter comply with that ordinance, then, for purposes of carrying out its obligations under this Section, the Tribal Gaming Agency shall be considered to be an entity entitled to receive state summary criminal history information within the meaning of subdivision (b)(12) of section 11105 of the California Penal Code. The California Department of Justice shall provide services to the Tribal Gaming Agency through the California Law Enforcement Telecommunications System

(CLETS), subject to a determination by the CLETS advisory committee that the Tribal Gaming Agency is qualified for receipt of such services, and on such terms and conditions as are deemed reasonable by that advisory committee.

Sec. 6.4.9. Temporary Licensing of Gaming Employees. Notwithstanding anything herein to the contrary, if the applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the investigation or other information held by that agency does not indicate that the applicant has a criminal history or other information in his or her background that would either automatically disqualify the applicant from obtaining a license or cause a reasonable person to investigate further before issuing a license, or is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary license and may impose such specific conditions thereon pending completion of the applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine. Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary license. A temporary license shall remain in effect until suspended or revoked, or a final determination is made on the application. At any time after issuance of a temporary license, the Tribal Gaming Agency may suspend or revoke it in accordance with Sections 6.5.1 or 6.5.5, and the State Gaming Agency may request suspension or revocation in accordance with subdivision (d) of Section 6.5.6. Nothing herein shall be construed to relieve the Tribe of any obligation under Part 558 of Title 25 of the Code of Federal Regulations.

Sec. 6.5. Gaming License Issuance. Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a license on a conditional or unconditional basis. Nothing herein shall create a property or other right of an applicant in an opportunity to be licensed, or in a license itself, both of which shall be considered to be privileges granted to the applicant in the sole discretion of the Tribal Gaming Agency.

Sec. 6.5.1. Denial, Suspension, or Revocation of Licenses. (a) Any application for a gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the applicant is determined to be unsuitable or otherwise unqualified for a gaming license. Pending consideration of revocation, the Tribal Gaming Agency may suspend a license in accordance with Section 6.5.5. All rights to notice and hearing shall be governed by tribal law, as to which the applicant will be notified in writing along with notice of an intent to suspend or revoke the license.

(b) (i) Except as provided in paragraph (ii) below, upon receipt of notice that the State Gaming Agency has determined that a person would be unsuitable for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency, the Tribal Gaming Agency shall promptly revoke any license that has theretofore been issued to the person; provided that the Tribal Gaming Agency may, in its discretion, re-issue a license to the person following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court conducted pursuant to section 1085 of the

California Civil Code.

(ii) Notwithstanding a determination of unsuitability by the State Gaming Agency, the Tribal Gaming Agency may, in its discretion, decline to revoke a tribal license issued to a person employed by the Tribe pursuant to Section 6.4.4(c) or Section 6.4.4(d).

Sec. 6.5.2. Renewal of Licenses; Extensions; Further Investigation. The term of a tribal gaming license shall not exceed two years, and application for renewal of a license must be made prior to its expiration. Applicants for renewal of a license shall provide updated material as requested, on the appropriate renewal forms, but, at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or that is otherwise available to the Tribal Gaming Agency. At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the applicant's continuing suitability or eligibility for a license. Prior to renewing a license, the Tribal Gaming Agency shall deliver to the State Gaming Agency copies of all information and documents received in connection with the application for renewal.

Sec. 6.5.3. Identification Cards. The Tribal Gaming Agency shall require that all persons who are required to be licensed wear, in plain view at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency. Identification badges must display information including, but not limited to, a photograph and an identification number that is adequate to enable agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

Sec. 6.5.4. Fees for Tribal License. The fees for all tribal licenses shall be set by the Tribal Gaming Agency.

Sec. 6.5.5. Suspension of Tribal License. The Tribal Gaming Agency may summarily suspend the license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person or entity could constitute a threat to the public health or safety or may violate the Tribal Gaming Agency's licensing or other standards. Any right to notice or hearing in regard thereto shall be governed by Tribal law.

Sec. 6.5.6. State Certification Process. (a) Upon receipt of a completed license application and a determination by the Tribal Gaming Agency that it intends to issue the earlier of a temporary or permanent license, the Tribal Gaming Agency shall transmit to the State Gaming Agency a notice of intent to license the applicant, together with all of the following: (i) a copy of all tribal license application materials and information received by the Tribal Gaming Agency from the applicant; (ii) an original set of fingerprint cards; (iii) a current photograph; and (iv) except to the extent waived by the State Gaming Agency, such releases of information, waivers, and other completed and executed forms as have been obtained by the Tribal Gaming Agency. Except for an applicant for licensing as a non-key Gaming Employee, as defined by agreement between the Tribal Gaming Agency and the State Gaming Agency, the Tribal Gaming Agency shall require

the applicant also to file an application with the State Gaming Agency, prior to issuance of a temporary or permanent tribal gaming license, for a determination of suitability for licensure under the California Gambling Control Act. Investigation and disposition of that application shall be governed entirely by state law, and the State Gaming Agency shall determine whether the applicant would be found suitable for licensure in a gambling establishment subject to that Agency's jurisdiction. Additional information may be required by the State Gaming Agency to assist it in its background investigation, provided that such State Gaming Agency requirement shall be no greater than that which may be required of applicants for a State gaming license in connection with nontribal gaming activities and at a similar level of participation or employment. A determination of suitability is valid for the term of the tribal license held by the applicant, and the Tribal Gaming Agency shall require a licensee to apply for renewal of a determination of suitability at such time as the licensee applies for renewal of a tribal gaming license. The State Gaming Agency and the Tribal Gaming Agency (together with tribal gaming agencies under other gaming compacts) shall cooperate in developing standard licensing forms for tribal gaming license applicants, on a statewide basis, that reduce or eliminate duplicative or excessive paperwork, which forms and procedures shall take into account the Tribe's requirements under IGRA and the expense thereof.

(b) Background Investigations of Applicants. Upon receipt of completed license application information from the Tribal Gaming Agency, the State Gaming Agency may conduct a background investigation pursuant to state law to determine whether the applicant would be suitable to be licensed for association with a gambling establishment subject to the jurisdiction of the State Gaming Agency. If further investigation is required to supplement the investigation conducted by the Tribal Gaming Agency, the applicant will be required to pay the statutory application fee charged by the State Gaming Agency pursuant to California Business and Professions Code section 19941(a), but any deposit requested by the State Gaming Agency pursuant to section 19855 of that Code shall take into account reports of the background investigation already conducted by the Tribal Gaming Agency and the NIGC, if any. Failure to pay the application fee or deposit may be grounds for denial of the application by the State Gaming Agency. The State Gaming Agency and Tribal Gaming Agency shall cooperate in sharing as much background information as possible, both to maximize investigative efficiency and thoroughness, and to minimize investigative costs. Upon completion of the necessary background investigation or other verification of suitability, the State Gaming Agency shall issue a notice to the Tribal Gaming Agency certifying that the State has determined that the applicant would be suitable, or that the applicant would be unsuitable, for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency and, if unsuitable, stating the reasons therefor.

(c) The Tribe shall monthly provide the State Gaming Agency with the name, badge identification number, and job descriptions of all non-key Gaming Employees.

(d) Prior to denying an application for a determination of suitability, the State Gaming Agency shall notify the Tribal Gaming Agency and afford the Tribe an opportunity to be heard. If the State Gaming Agency denies an application for a determination of

suitability, that Agency shall provide the applicant with written notice of all appeal rights available under state law.

Sec. 7.0. COMPLIANCE ENFORCEMENT.

Sec. 7.1. On-Site Regulation. It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Gaming Compact, IGRA, and the Tribal Gaming Ordinance with respect to Gaming Operation and Facility compliance, and to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and the confidence of patrons that tribal government gaming in California meets the highest standards of regulation and internal controls. To meet those responsibilities, the Tribal Gaming Agency shall adopt and enforce regulations, procedures, and practices as set forth herein.

Sec. 7.2. Investigation and Sanctions. The Tribal Gaming Agency shall investigate any reported violation of this Gaming Compact and shall require the Gaming Operation to correct the violation upon such terms and conditions as the Tribal Gaming Agency determines are necessary. The Tribal Gaming Agency shall be empowered by the Tribal Gaming Ordinance to impose fines or other sanctions within the jurisdiction of the Tribe against gaming licensees or other persons who interfere with or violate the Tribe's gaming regulatory requirements and obligations under IGRA, the Tribal Gaming Ordinance, or this Gaming Compact. The Tribal Gaming Agency shall report significant or continued violations of this Compact or failures to comply with its orders to the State Gaming Agency.

Sec. 7.3. Assistance by State Gaming Agency. The Tribe may request the assistance of the State Gaming Agency whenever it reasonably appears that such assistance may be necessary to carry out the purposes described in Section 7.1, or otherwise to protect public health, safety, or welfare. If requested by the Tribe or Tribal Gaming Agency, the State Gaming Agency shall provide requested services to ensure proper compliance with this Gaming Compact. The State shall be reimbursed for its actual and reasonable costs of that assistance, if the assistance required expenditure of extraordinary costs.

Sec. 7.4. Access to Premises by State Gaming Agency; Notification; Inspections. Notwithstanding that the Tribe has the primary responsibility to administer and enforce the regulatory requirements of this Compact, the State Gaming Agency shall have the right to inspect the Tribe's Gaming Facility with respect to Class III Gaming Activities only, and all Gaming Operation or Facility records relating thereto, subject to the following conditions:

Sec. 7.4.1. Inspection of public areas of a Gaming Facility may be made at any time without prior notice during normal Gaming Facility business hours.

Sec. 7.4.2. Inspection of areas of a Gaming Facility not normally accessible to the public may be made at any time during normal Gaming Facility business hours, immediately

after the State Gaming Agency's authorized inspector notifies the Tribal Gaming Agency of his or her presence on the premises, presents proper identification, and requests access to the non-public areas of the Gaming Facility. The Tribal Gaming Agency, in its sole discretion, may require a member of the Tribal Gaming Agency to accompany the State Gaming Agency inspector at all times that the State Gaming Agency inspector is in a non-public area of the Gaming Facility. If the Tribal Gaming Agency imposes such a requirement, it shall require such member to be available at all times for those purposes and shall ensure that the member has the ability to gain immediate access to all non-public areas of the Gaming Facility. Nothing in this Compact shall be construed to limit the State Gaming Agency to one inspector during inspections.

Sec. 7.4.3. (a) Inspection and copying of Gaming Operation papers, books, and records may occur at any time, immediately after notice to the Tribal Gaming Agency, during the normal hours of the Gaming Facility's business office, provided that the inspection and copying of those papers, books or records shall not interfere with the normal functioning of the Gaming Operation or Facility. Notwithstanding any other provision of California law, all information and records that the State Gaming Agency obtains, inspects, or copies pursuant to this Compact shall be, and remain, the property solely of the Tribe; provided that such records and copies may be retained by the State Gaming Agency as reasonably necessary for completion of any investigation of the Tribe's compliance with this Compact.

(b)(i) The State Gaming Agency will exercise utmost care in the preservation of the confidentiality of any and all information and documents received from the Tribe, and will apply the highest standards of confidentiality expected under state law to preserve such information and documents from disclosure. The Tribe may avail itself of any and all remedies under state law for improper disclosure of information or documents. To the extent reasonably feasible, the State Gaming Agency will consult with representatives of the Tribe prior to disclosure of any documents received from the Tribe, or any documents compiled from such documents or from information received from the Tribe, including any disclosure compelled by judicial process, and, in the case of any disclosure compelled by judicial process, will endeavor to give the Tribe immediate notice of the order compelling disclosure and a reasonable opportunity to interpose an objection thereto with the court.

(ii) The Tribal Gaming Agency and the State Gaming Agency shall confer and agree upon protocols for release to other law enforcement agencies of information obtained during the course of background investigations.

(c) Records received by the State Gaming Agency from the Tribe in compliance with this Compact, or information compiled by the State Gaming Agency from those records, shall be exempt from disclosure under the California Public Records Act.

Sec. 7.4.4. Notwithstanding any other provision of this Compact, the State Gaming Agency shall not be denied access to papers, books, records, equipment, or places where

such access is reasonably necessary to ensure compliance with this Compact.

Sec. 7.4.5. (a) Subject to the provisions of subdivision (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's land except in accordance with procedures established by agreement between the State Gaming Agency and the Tribal Gaming Agency and upon at least 10 days' notice to the Sheriff's Department for the county in which the land is located.

(b) Transportation of a Gaming Device from the Gaming Facility within California is permissible only if: (i) The final destination of the device is a gaming facility of any tribe in California that has a compact with the State; (ii) The final destination of the device is any other state in which possession of the device or devices is made lawful by state law or by tribal-state compact; (iii) The final destination of the device is another country, or any state or province of another country, wherein possession of the device is lawful; or (iv) The final destination is a location within California for testing, repair, maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency and has been found suitable for licensure by the State Gaming Agency.

(c) Gaming Devices transported off the Tribe's land in violation of this Section 7.4.5 or in violation of any permit issued pursuant thereto is subject to summary seizure by California peace officers.

Sec. 8.0. RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE TRIBAL GAMING OPERATION.

Sec. 8.1. Adoption of Regulations for Operation and Management; Minimum Standards. In order to meet the goals set forth in this Gaming Compact and required of the Tribe by law, the Tribal Gaming Agency shall be vested with the authority to promulgate, and shall promulgate, at a minimum, rules and regulations or specifications governing the following subjects, and to ensure their enforcement in an effective manner:

Sec. 8.1.1. The enforcement of all relevant laws and rules with respect to the Gaming Operation and Facility, and the power to conduct investigations and hearings with respect thereto, and to any other subject within its jurisdiction.

Sec. 8.1.2. Ensuring the physical safety of Gaming Operation patrons and employees, and any other person while in the Gaming Facility. Nothing herein shall be construed to make applicable to the Tribe any state laws, regulations, or standards governing the use of tobacco.

Sec. 8.1.3. The physical safeguarding of assets transported to, within, and from the Gaming Facility.

Sec. 8.1.4. The prevention of illegal activity from occurring within the Gaming Facility or with regard to the Gaming Operation, including, but not limited to, the maintenance of

employee procedures and a surveillance system as provided below.

Sec. 8.1.5. The recording of any and all occurrences within the Gaming Facility that deviate from normal operating policies and procedures (hereafter "incidents"). The procedure for recording incidents shall: (1) specify that security personnel record all incidents, regardless of an employee's determination that the incident may be immaterial (all incidents shall be identified in writing); (2) require the assignment of a sequential number to each report; (3) provide for permanent reporting in indelible ink in a bound notebook from which pages cannot be removed and in which entries are made on each side of each page; and (4) require that each report include, at a minimum, all of the following:

(a) The record number.

(b) The date.

(c) The time.

(d) The location of the incident.

(e) A detailed description of the incident.

(f) The persons involved in the incident.

(g) The security department employee assigned to the incident.

Sec. 8.1.6. The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like, consistent with industry practice.

Sec. 8.1.7. Maintenance of a list of persons barred from the Gaming Facility who, because of their past behavior, criminal history, or association with persons or organizations, pose a threat to the integrity of the Gaming Activities of the Tribe or to the integrity of regulated gaming within the State.

Sec. 8.1.8. The conduct of an audit of the Gaming Operation, not less than annually, by an independent certified public accountant, in accordance with the auditing and accounting standards for audits of casinos of the American Institute of Certified Public Accountants.

Sec. 8.1.9. Submission to, and prior approval, from the Tribal Gaming Agency of the rules and regulations of each Class III game to be operated by the Tribe, and of any changes in those rules and regulations. No Class III game may be played that has not received Tribal Gaming Agency approval.

Sec. 8.1.10. Addressing all of the following:

(a) Maintenance of a copy of the rules, regulations, and procedures for each game as played, including, but not limited to, the method of play and the odds and method of determining amounts paid to winners;

(b) Specifications and standards to ensure that information regarding the method of play, odds, and payoff determinations shall be visibly displayed or available to patrons in written form in the Gaming Facility;

(c) Specifications ensuring that betting limits applicable to any gaming station shall be displayed at that gaming station;

(d) Procedures ensuring that in the event of a patron dispute over the application of any gaming rule or regulation, the matter shall be handled in accordance with, industry practice and principles of fairness, pursuant to the Tribal Gaming Ordinance and any rules and regulations promulgated by the Tribal Gaming Agency.

Sec. 8.1.11. Maintenance of a closed-circuit television surveillance system consistent with industry standards for gaming facilities of the type and scale operated by the Tribe, which system shall be approved by, and may not be modified without the approval of, the Tribal Gaming Agency. The Tribal Gaming Agency shall have current copies of the Gaming Facility floor plan and closed-circuit television system at all times, and any modifications thereof first shall be approved by the Tribal Gaming Agency.

Sec. 8.1.12. Maintenance of a cashier's cage in accordance with industry standards for such facilities.

Sec. 8.1.13. Specification of minimum staff and supervisory requirements for each Gaming Activity to be conducted.

Sec. 8.1.14. Technical standards and specifications for the operation of Gaming Devices and other games authorized herein to be conducted by the Tribe, which technical specifications may be no less stringent than those approved by a recognized gaming testing laboratory in the gaming industry.

Sec. 8.2. State Civil and Criminal Jurisdiction. Nothing in this Gaming Compact affects the civil or criminal jurisdiction of the State under Public Law 280 (18 U.S.C. Sec. 1162; 28 U.S.C. Sec. 1360) or IGRA, to the extent applicable. In addition, criminal jurisdiction to enforce state gambling laws is transferred to the State pursuant to 18 U.S.C. § 1166(d), provided that no Gaming Activity conducted by the Tribe pursuant to this Gaming Compact may be deemed to be a civil or criminal violation of any law of the State.

Sec. 8.3. (a) The Tribe shall take all reasonable steps to ensure that members of the Tribal Gaming Agency are free from corruption, undue influence, compromise, and conflicting interests in the conduct of their duties under this Compact; shall adopt a conflict-of-interest code to that end; and shall ensure the prompt removal of any member of the

Tribal Gaming Agency who is found to have acted in a corrupt or compromised manner.

(b) The Tribe shall conduct a background investigation on a prospective member of the Tribal Gaming Agency, who shall meet the background requirements of a management contractor under IGRA; provided that, if such official is elected through a tribal election process, that official may not participate in any Tribal Gaming Agency matters under this Compact unless a background investigation has been concluded and the official has been found to be suitable. If requested by the tribal government or the Tribal Gaming Agency, the State Gaming Agency may assist in the conduct of such a background investigation and may assist in the investigation of any possible corruption or compromise of a member of the agency.

Sec. 8.4. In order to foster statewide uniformity of regulation of Class III gaming operations throughout the state, rules, regulations, standards, specifications, and procedures of the Tribal Gaming Agency in respect to any matter encompassed by Sections 6.0, 7.0, or 8.0 shall be consistent with regulations adopted by the State Gaming Agency in accordance with Section 8.4.1. Chapter 3.5 (commencing with section 11340) of Part 1 of Division 3 of Title 2 of the California Government Code does not apply to regulations adopted by the State Gaming Agency in respect to tribal gaming operations under this Section.

Sec. 8.4.1. (a) Except as provided in subdivision (d), no State Gaming Agency regulation shall be effective with respect to the Tribe's Gaming Operation unless it has first been approved by the Association and the Tribe has had an opportunity to review and comment on the proposed regulation.

(b) Every State Gaming Agency regulation that is intended to apply to the Tribe (other than a regulation proposed or previously approved by the Association) shall be submitted to the Association for consideration prior to submission of the regulation to the Tribe for comment as provided in subdivision (c). A regulation that is disapproved by the Association shall not be submitted to the Tribe for comment unless it is re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections.

(c) Except as provided in subdivision (d), no regulation of the State Gaming Agency shall be adopted as a final regulation in respect to the Tribe's Gaming Operation before the expiration of 30 days after submission of the proposed regulation to the Tribe for comment as a proposed regulation, and after consideration of the Tribe's comments, if any.

(d) In exigent circumstances (e.g., imminent threat to public health and safety), the State Gaming Agency may adopt a regulation that becomes effective immediately. Any such regulation shall be accompanied by a detailed, written description of the exigent circumstances, and shall be submitted immediately to the Association for consideration. If the regulation is disapproved by the Association, it shall cease to be effective, but may be re-adopted by the State Gaming Agency as a proposed regulation, in its original or

amended form, with a detailed, written response to the Association's objections, and thereafter submitted to the Tribe for comment as provided in subdivision (c).

(e) The Tribe may object to a State Gaming Agency regulation on the ground that it is unnecessary, unduly burdensome, or unfairly discriminatory, and may seek repeal or amendment of the regulation through the dispute resolution process of Section 9.0.

Sec. 9.0. DISPUTE RESOLUTION PROVISIONS.

Sec. 9.1. Voluntary Resolution; Reference to Other Means of Resolution. In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that occur under this Gaming Compact by good faith negotiations whenever possible. Therefore, without prejudice to the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the parties hereby establish a threshold requirement that disputes between the Tribe and the State first be subjected to a process of meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of performance and compliance by each other with the terms, provisions, and conditions of this Gaming Compact, as follows:

(a) Either party shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth, with specificity, the issues to be resolved.

(b) The parties shall meet and confer in a good faith attempt to resolve the dispute through negotiation not later than 10 days after receipt of the notice, unless both parties agree in writing to an extension of time.

(c) If the dispute is not resolved to the satisfaction of the parties within 30 calendar days after the first meeting, then either party may seek to have the dispute resolved by an arbitrator in accordance with this section, but neither party shall be required to agree to submit to arbitration.

(d) Disagreements that are not otherwise resolved by arbitration or other mutually acceptable means as provided in Section 9.3 may be resolved in the United States District Court where the Tribe's Gaming Facility is located, or is to be located, and the Ninth Circuit Court of Appeals (or, if those federal courts lack jurisdiction, in any state court of competent jurisdiction and its related courts of appeal). The disputes to be submitted to court action include, but are not limited to, claims of breach or violation of this Compact, or failure to negotiate in good faith as required by the terms of this Compact. In no event may the Tribe be precluded from pursuing any arbitration or judicial remedy against the State on the grounds that the Tribe has failed to exhaust its state administrative remedies. The parties agree that, except in the case of imminent threat to the public health or safety, reasonable efforts will be made to explore alternative dispute resolution avenues prior to resort to judicial process.

Sec. 9.2. Arbitration Rules. Arbitration shall be conducted in accordance with the policies

and procedures of the Commercial Arbitration Rules of the American Arbitration Association, and shall be held on the Tribe's land or, if unreasonably inconvenient under the circumstances, at such other location as the parties may agree. Each side shall bear its own costs, attorneys' fees, and one-half the costs and expenses of the American Arbitration Association and the arbitrator, unless the arbitrator rules otherwise. Only one neutral arbitrator may be named, unless the Tribe or the State objects, in which case a panel of three arbitrators (one of whom is selected by each party) will be named. The provisions of Section 1283.05 of the California Code of Civil Procedure shall apply; provided that no discovery authorized by that section may be conducted without leave of the arbitrator. The decision of the arbitrator shall be in writing, give reasons for the decision, and shall be binding. Judgment on the award may be entered in any federal or state court having jurisdiction thereof.

Sec. 9.3. No Waiver or Preclusion of Other Means of Dispute Resolution. This Section 9.0 may not be construed to waive, limit, or restrict any remedy that is otherwise available to either party, nor may this Section be construed to preclude, limit, or restrict the ability of the parties to pursue, by mutual agreement, any other method of dispute resolution, including, but not limited to, mediation or utilization of a technical advisor to the Tribal and State Gaming Agencies; provided that neither party is under any obligation to agree to such alternative method of dispute resolution.

Sec. 9.4. Limited Waiver of Sovereign Immunity. (a) In the event that a dispute is to be resolved in federal court or a state court of competent jurisdiction as provided in this Section 9.0, the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that:

(1) The dispute is limited solely to issues arising under this Gaming Compact;

(2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought); and

(3) No person or entity other than the Tribe and the State is party to the action, unless failure to join a third party would deprive the court of jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State in respect to any such third party.

(b) In the event of intervention by any additional party into any such action without the consent of the Tribe and the State, the waivers of either the Tribe or the State provided for herein may be revoked, unless joinder is required to preserve the court's jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State in respect to any such third party.

(c) The waivers and consents provided for under this Section 9.0 shall extend to civil actions authorized by this Compact, including, but not limited to, actions to compel arbitration, any arbitration proceeding herein, any action to confirm or enforce any

judgment or arbitration award as provided herein, and any appellate proceedings emanating from a matter in which an immunity waiver has been granted. Except as stated herein or elsewhere in this Compact, no other waivers or consents to be sued, either express or implied, are granted by either party.

Sec. 10.0. PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY.

Sec. 10.1. The Tribe will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare; provided that nothing herein shall be construed to make applicable to the Tribe any state laws or regulations governing the use of tobacco.

Sec. 10.2. Compliance. For the purposes of this Gaming Compact, the Tribal Gaming Operation shall:

(a) Adopt and comply with standards no less stringent than state public health standards for food and beverage handling. The Gaming Operation will allow inspection of food and beverage services by state or county health inspectors, during normal hours of operation, to assess compliance with these standards, unless inspections are routinely made by an agency of the United States government to ensure compliance with equivalent standards of the United States Public Health Service. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(b) Adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California; the Gaming Operation will allow for inspection and testing of water quality by state or county health inspectors, as applicable, during normal hours of operation, to assess compliance with these standards, unless inspections and testing are made by an agency of the United States pursuant to, or by the Tribe under express authorization of, federal law, to ensure compliance with federal water quality and safe drinking water standards. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(c) Comply with the building and safety standards set forth in Section 6.4.

(d) Carry no less than five million dollars ($5,000,000) in public liability insurance for patron claims, and that the Tribe provide reasonable assurance that those claims will be promptly and fairly adjudicated, and that legitimate claims will be paid; provided that nothing herein requires the Tribe to agree to liability for punitive damages or attorneys' fees. On or before the effective date of this Compact or not less than 30 days prior to the commencement of Gaming Activities under this Compact, whichever is later, the Tribe shall adopt and make available to patrons a tort liability ordinance setting forth the terms and conditions, if any, under which the Tribe waives immunity to suit for money damages resulting from intentional or negligent injuries to person or property at the Gaming

Facility or in connection with the Tribe's Gaming Operation, including procedures for processing any claims for such money damages; provided that nothing in this Section shall require the Tribe to waive its immunity to suit except to the extent of the policy limits set out above.

(e) Adopt and comply with standards no less stringent than federal workplace and occupational health and safety standards; the Gaming Operation will allow for inspection of Gaming Facility workplaces by state inspectors, during normal hours of operation, to assess compliance with these standards, unless inspections are regularly made by an agency of the United States government to ensure compliance with federal workplace and occupational health and safety standards. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(f) Comply with tribal codes and other applicable federal law regarding public health and safety.

(g) Adopt and comply with standards no less stringent than federal laws and state laws forbidding employers generally from discriminating in the employment of persons to work for the Gaming Operation or in the Gaming Facility on the basis of race, color, religion, national origin, gender, sexual orientation, age, or disability; provided that nothing herein shall preclude the tribe from giving a preference in employment to Indians, pursuant to a duly adopted tribal ordinance.

(h) Adopt and comply with standards that are no less stringent than state laws prohibiting a gaming enterprise from cashing any check drawn against a federal, state, county, or city fund, including but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments.

(i) Adopt and comply with standards that are no less stringent than state laws, if any, prohibiting a gaming enterprise from providing, allowing, contracting to provide, or arranging to provide alcoholic beverages, or food or lodging for no charge or at reduced prices at a gambling establishment or lodging facility as an incentive or enticement.

(j) Adopt and comply with standards that are no less stringent than state laws, if any, prohibiting extensions of credit.

(k) Provisions of the Bank Secrecy Act, P.L. 91-508, October 26, 1970, 31 U.S.C. Sec. 5311-5314, as amended, and all reporting requirements of the Internal Revenue Service, insofar as such provisions and reporting requirements are applicable to casinos.

Sec. 10.2.1. The Tribe shall adopt and, not later than 30 days after the effective date of this Compact, shall make available on request the standards described in subdivisions (a)-(c) and (e)-(k) of Section 10.2 to which the Gaming Operation is held. In the absence of a promulgated tribal standard in respect to a matter identified in those subdivisions, or the express adoption of an applicable federal statute or regulation in lieu of a tribal standard

in respect to any such matter, the applicable state statute or regulation shall be deemed to have been adopted by the Tribe as the applicable standard.

Sec. 10.3 Participation in state statutory programs related to employment. (a) In lieu of permitting the Gaming Operation to participate in the state statutory workers' compensation system, the Tribe may create and maintain a system that provides redress for employee work-related injuries through requiring insurance or self-insurance, which system must include a scope of coverage, availability of an independent medical examination, right to notice, hearings before an independent tribunal, a means of enforcement against the employer, and benefits comparable to those mandated for comparable employees under state law. Not later than the effective date of this Compact, or 60 days prior to the commencement of Gaming Activities under this Compact, the Tribe will advise the State of its election to participate in the statutory workers' compensation system or, alternatively, will forward to the State all relevant ordinances that have been adopted and all other documents establishing the system and demonstrating that the system is fully operational and compliant with the comparability standard set forth above. The parties agree that independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

(b) The Tribe agrees that its Gaming Operation will participate in the State's program for providing unemployment compensation benefits and unemployment compensation disability benefits with respect to employees employed at the Gaming Facility, including compliance with the provisions of the California Unemployment Insurance Code, and the Tribe consents to the jurisdiction of the state agencies charged with the enforcement of that Code and of the courts of the State of California for purposes of enforcement.

(c) As a matter of comity, with respect to persons employed at the Gaming Facility, other than members of the Tribe, the Tribal Gaming Operation shall withhold all taxes due to the State as provided in the California Unemployment Insurance Code and the Revenue and Taxation Code, and shall forward such amounts as provided in said Codes to the State.

Sec. 10.4. Emergency Service Accessibility. The Tribe shall make reasonable provisions for adequate emergency fire, medical, and related relief and disaster services for patrons and employees of the Gaming Facility.

Sec. 10.5. Alcoholic Beverage Service. Standards for alcohol service shall be subject to applicable law.

Sec. 10.6. Possession of firearms shall be prohibited at all times in the Gaming Facility except for state, local, or tribal security or law enforcement personnel authorized by tribal law and by federal or state law to possess fire arms at the Facility.

Sec. 10.7. Labor Relations.

Notwithstanding any other provision of this Compact, this Compact shall be null and void

if, on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.

Sec. 10.8. Off-Reservation Environmental Impacts.

Sec. 10.8.1. On or before the effective date of this Compact, or not less than 90 days prior to the commencement of a Project, as defined herein, the Tribe shall adopt an ordinance providing for the preparation, circulation, and consideration by the Tribe of environmental impact reports concerning potential off-Reservation environmental impacts of any and all Projects to be commenced on or after the effective date of this Compact. In fashioning the environmental protection ordinance, the Tribe will make a good faith effort to incorporate the policies and purposes of the National Environmental Policy Act and the California Environmental Quality Act consistent with the Tribe's governmental interests.

Sec. 10.8.2. (a) Prior to commencement of a Project, the Tribe will:

(1) Inform the public of the planned Project;

(2) Take appropriate actions to determine whether the project will have any significant adverse impacts on the off-Reservation environment;

(3) For the purpose of receiving and responding to comments, submit all environmental impact reports concerning the proposed Project to the State Clearinghouse in the Office of Planning and Research and the county board of supervisors, for distribution to the public.

(4) Consult with the board of supervisors of the county or counties within which the Tribe's Gaming Facility is located, or is to be located, and, if the Gaming Facility is within a city, with the city council, and if requested by the board or council, as the case may be, meet with them to discuss mitigation of significant adverse off-Reservation environmental impacts;

(5) Meet with and provide an opportunity for comment by those members of the public residing off-Reservation within the vicinity of the Gaming Facility such as might be adversely affected by proposed Project.

(b) During the conduct of a Project, the Tribe shall:

(1) Keep the board or council, as the case may be, and potentially affected members of the public apprized of the project's progress; and

(2) Make good faith efforts to mitigate any and all such significant adverse off-Reservation environmental impacts.

(c) As used in Section 10.8.1 and this Section 10.8.2, the term "Project" means any expansion or any significant renovation or modification of an existing Gaming Facility, or any significant excavation, construction, or development associated with the Tribe's Gaming Facility or proposed Gaming Facility and the term "environmental impact reports" means any environmental assessment, environmental impact report, or environmental impact statement, as the case may be.

Sec. 10.8.3. (a) The Tribe and the State shall, from time to time, meet to review the adequacy of this Section 10.8, the Tribe's ordinance adopted pursuant thereto, and the Tribe's compliance with its obligations under Section 10.8.2, to ensure that significant adverse impacts to the off-Reservation environment resulting from projects undertaken by the Tribe may be avoided or mitigated.

(b) At any time after January 1, 2003, but not later than March 1, 2003, the State may request negotiations for an amendment to this Section 10.8 on the ground that, as it presently reads, the Section has proven to be inadequate to protect the off-Reservation environment from significant adverse impacts resulting from Projects undertaken by the Tribe or to ensure adequate mitigation by the Tribe of significant adverse off-Reservation environmental impacts and, upon such a request, the Tribe will enter into such negotiations in good faith.

(c) On or after January 1, 2004, the Tribe may bring an action in federal court under 25 U.S.C. Sec. 2710(d)(7)(A)(i) on the ground that the State has failed to negotiate in good faith, provided that the Tribe's good faith in the negotiations shall also be in issue. In any such action, the court may consider whether the State's invocation of its rights under subdivision (b) of this Section 10.8.3 was in good faith. If the State has requested negotiations pursuant to subdivision (b) but, as of January 1, 2005, there is neither an agreement nor an order against the State under 25 U.S.C. Sec. 2710(d)(7)(B)(iii), then, on that date, the Tribe shall immediately cease construction and other activities on all projects then in progress that have the potential to cause adverse off-Reservation impacts, unless and until an agreement to amend this Section 10.8 has been concluded between the Tribe and the State.

Sec. 11.0. EFFECTIVE DATE AND TERM OF COMPACT.

Sec. 11.1. Effective Date. This Gaming Compact shall not be effective unless and until all of the following have occurred:

(a) The Compact is ratified by statute in accordance with state law;

(b) Notice of approval or constructive approval is published in the Federal Register as provided in 25 U.S.C. 2710(d)(3)(B); and

(c) SCA 11 is approved by the California voters in the March 2000 general election.

Sec. 11.2. Term of Compact; Termination.

Sec. 11.2.1. Effective. (a) Once effective this Compact shall be in full force and effect for state law purposes until December 31, 2020.

(b) Once ratified, this Compact shall constitute a binding and determinative agreement between the Tribe and the State, without regard to voter approval of any constitutional amendment, other than SCA 11, that authorizes a gaming compact.

(c) Either party may bring an action in federal court, after providing a sixty (60) day written notice of an opportunity to cure any alleged breach of this Compact, for a declaration that the other party has materially breached this Compact. Upon issuance of such a declaration, the complaining party may unilaterally terminate this Compact upon service of written notice on the other party. In the event a federal court determines that it lacks jurisdiction over such an action, the action may be brought in the superior court for the county in which the Tribe's Gaming Facility is located. The parties expressly waive their immunity to suit for purposes of an action under this subdivision, subject to the qualifications stated in Section 9.4(a).

Sec. 12.0. AMENDMENTS; RENEGOTIATIONS.

Sec. 12.1. The terms and conditions of this Gaming Compact may be amended at any time by the mutual and written agreement of both parties.

Sec. 12.2. This Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose, provided that no such renegotiation may be sought for 12 months following the effective date of this Gaming Compact.

Sec. 12.3. Process and Negotiation Standards. All requests to amend or renegotiate this Gaming Compact shall be in writing, addressed to the Tribal Chairperson or the Governor, as the case may be, and shall include the activities or circumstances to be negotiated, together with a statement of the basis supporting the request. If the request meets the requirements of this Section, the parties shall confer promptly and determine a schedule for commencing negotiations within 30 days of the request. Unless expressly provided otherwise herein, all matters involving negotiations or other amendatory processes under Section 4.3.3(b) and this Section 12.0 shall be governed, controlled, and conducted in conformity with the provisions and requirements of IGRA, including those provisions regarding the obligation of the State to negotiate in good faith and the enforcement of that obligation in federal court. The Chairperson of the Tribe and the Governor of the State are hereby authorized to designate the person or agency responsible for conducting the negotiations, and shall execute any documents necessary to do so.

Sec. 12.4. The Tribe shall have the right to terminate this Compact in the event the

exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a state statute or constitutional provision, or the conclusive and dispositive judicial construction of a statute or the state Constitution by a California appellate court after the effective date of this Compact, that Gaming Devices may lawfully be operated by another person, organization, or entity (other than an Indian tribe pursuant to a compact) within California.

Sec. 13.0 NOTICES.

Unless otherwise indicated by this Gaming Compact, all notices required or authorized to be served shall be served by first-class mail at the following addresses:

| Governor | Tribal Chairperson |
|---|---|
| State Capitol | *1 |
| Sacramento, California 95814 | *4 |

Sec. 14.0. CHANGES IN IGRA. This Gaming Compact is intended to meet the requirements of IGRA as it reads on the effective date of this Gaming Compact, and when reference is made to the Indian Gaming Regulatory Act or to an implementing regulation thereof, the referenced provision is deemed to have been incorporated into this Compact as if set out in full. Subsequent changes to IGRA that diminish the rights of the State or the Tribe may not be applied retroactively to alter the terms of this Gaming Compact, except to the extent that federal law validly mandates that retroactive application without the State's or the Tribe's respective consent

Sec. 15.0. MISCELLANEOUS.

Sec. 15.1. Third Party Beneficiaries. Except to the extent expressly provided under this Gaming Compact, this Gaming Compact is not intended to, and shall not be construed to, create any right on the part of a third party to bring an action to enforce any of its terms.

Sec. 15.2. Complete agreement; revocation of prior requests to negotiate. This Gaming Compact, together with all addenda and approved amendments, sets forth the full and complete agreement of the parties and supersedes any prior agreements or understandings with respect to the subject matter hereof.

Sec. 15.3. Construction. Neither the presence in another tribal-state compact of language that is not included in this Compact, nor the absence in this Compact of language that is present in another tribal-state compact shall be a factor in construing the terms of this Compact.

Sec. 15.4. Most Favored Tribe. If, after the effective date of this Compact, the State enters into a Compact with any other tribe that contains more favorable provisions with

respect to any provisions of this Compact, the State shall, at the Tribe's request, enter into the preferred compact with the Tribe as a superseding substitute for this Compact; provided that the duration of the substitute compact shall not exceed the duration of this Compact.

Sec. 15.6. Representations.

By entering into this Compact, the Tribe expressly represents that, as of the date of the Tribe's execution of this Compact: (a) the undersigned has the authority to execute this Compact on behalf of his or her tribe and will provide written proof of such authority and ratification of this Compact by the tribal governing body no later than October 9, 1999; (b) the Tribe is (i) recognized as eligible by the Secretary of the Interior for special programs and services provided by the United States to Indians because of their status as Indians, and (ii) recognized by the Secretary of the Interior as possessing powers of self-government. In entering into this Compact, the State expressly relies upon the foregoing representations by the Tribe, and the State's entry into the Compact is expressly made contingent upon the truth of those representations as of the date of the Tribe's execution of this Compact. Failure to provide written proof of authority to execute this Compact or failure to provide written proof of ratification by the Tribe's governing body will give the State the opportunity to declare this Compact null and void.

IN WITNESS WHEREOF, the undersigned sign this Compact on behalf of the State of California and the *1.

Done at Sacramento, California, this 10th day of September 1999.


STATE OF CALIFORNIA                             *1




By Gray Davis                         By *5

Governor of the State of California              Chairperson of the *1

# EXHIBIT 2

# AMENDMENT TO

# THE TRIBAL-STATE COMPACT

# BETWEEN

# THE STATE OF CALIFORNIA

# AND THE

# SAN MANUEL BAND OF

# MISSION INDIANS

## AMENDMENT TO TRIBAL-STATE COMPACT
## BETWEEN THE STATE OF CALIFORNIA
## AND THE SAN MANUEL BAND OF MISSION INDIANS

WHEREAS, the State of California (hereinafter "the State") and the San Manuel Band of Mission Indians of California (hereinafter "the Tribe") entered into a compact in 1999 (hereinafter the "1999 Compact"); and

WHEREAS, the Tribe has a history of working with San Bernardino County and local communities on land use, economic development, and other matters of mutual interest; and

WHEREAS, the State and the Tribe have agreed to revise the 1999 Compact to promote continued good relations between tribal, state, and local governments and to enhance tribal economic development and self-sufficiency; and

WHEREAS, the Tribe agrees to make a fair revenue contribution to the State, to enter into arrangements to mitigate to the extent practicable the off-reservation environmental and direct fiscal impacts of its Gaming Facility on local communities and local governments, and to offer additional consumer protections; and

WHEREAS, in recognition of the fair revenue contribution and the measures enhancing protections for local governments and the public and to provide a sound basis for the Tribe's decisions with respect to investment in, and the operation of, its Gaming Activities, the State agrees to amend the 1999 Compact to afford the opportunity to operate additional Gaming Devices and to extend the term of the Compact; and

WHEREAS, the Tribe wishes to increase its commitment to share revenues with tribes in California that receive monies from the Revenue Sharing Trust Fund; and

WHEREAS, the State and the Tribe have concluded that this amendment to the 1999 Compact provides for a fair contribution to the State from the Tribe's Gaming Operation, enhances the Tribe's exclusive right to operate slot machines, protects the interests of the Tribe and the California public, and will promote and secure long-term stability, mutual respect, and mutual benefits; and

1

WHEREAS, the State and the Tribe recognize that this amendment is authorized and negotiated and shall take effect pursuant to the Indian Gaming Regulatory Act ("IGRA"); and

WHEREAS, the State and the Tribe agree that all terms of this amendment to the 1999 Compact (collectively the "Amended Compact") are intended to be binding and enforceable.

NOW, THEREFORE, the Tribe and the State hereby amend the 1999 Compact as follows:

## I. *AUTHORIZED FACILITIES*

**Section 4.2** is repealed and replaced by the following:

**Section 4.2**. Authorized Gaming Facilities. The Tribe may establish and operate not more than two (2) Gaming Facilities within the boundaries of its Reservation and only on the Tribe's Indian lands existing as of the execution date of this Amended Compact.  The Gaming Facilities shall be located at (1) 777 San Manuel Boulevard, Highland, California 92346; and (2) one additional location on the Tribe's Indian lands.  The Tribe may operate in each Gaming Facility any forms and kinds of gaming permitted by law, but only to the extent allowed under IGRA, this Amended Compact, and the Tribe's Gaming Ordinance.

## II. *REVENUE CONTRIBUTION*

A.      Sections **2.15, 4.3.2.3, 5.0, 5.1, 5.2,** and **5.3** are repealed.

B.      **Section 4.3.1** is repealed and replaced by the following:

**Section 4.3.1.**

(a)      The Tribe is entitled to operate no more than seven thousand five hundred (7,500) Gaming Devices, as set forth below, but its right to operate any Gaming Devices shall be conditioned upon its making the payments set forth under subdivision (b) in accordance with the terms set forth in subdivision (c).   The number of Gaming Devices that may be operated is:

2

(i)  974, which were operated on September 1, 1999; and

(ii)  1,026, operated pursuant to licenses previously issued in accordance with former Section 4.3.2.2 of the 1999 Compact, which licenses shall be maintained during the term of this Amended Compact pursuant to Section 4.3.2.2 herein; and

(iii)  up to 5,500 additional Gaming Devices.

(b)     The Tribe agrees that in consideration of the exclusive right to operate Gaming Devices within the geographic region specified in Section 3.2 of this Amended Compact and to operate additional Gaming Devices outside the licensing system established by the 1999 Compact, and other valuable consideration, the Tribe shall pay to the State the following:

(i)  an annual payment of forty five million dollars ($45,000,000); and

(ii)  an annual payment for the operation of the additional Gaming Devices identified in subdivision (a)(iii) of:  (1) fifteen percent (15%) of the Net Win generated from the operation of up to three thousand (3,000) additional Gaming Devices over the existing two thousand (2,000) Gaming Devices specified in subdivisions (a)(i) and (a)(ii); plus (2) twenty-five (25%) percent of the Net Win generated from the operation of up to an additional two thousand five hundred (2,500) Gaming Devices.

The payments specified in this subdivision (b) have been negotiated between the parties as a reasonable contribution to be made annually in quarterly payments based upon the Tribe's market conditions, its circumstances, and the rights afforded by this Amendment.

(c)     The Tribe shall remit the annual payments referenced in subdivision (b) to such agency, trust, fund or entity, as the State Director of Finance, pursuant to law, from time to time, shall specify to the Tribe in writing, in quarterly payments.  The quarterly payments shall be due on the thirtieth (30th) day following the end of each calendar quarter (i.e., by April 30 for the first quarter, July 30 for the second quarter, October

3

30 for the third quarter, and January 30 for the fourth quarter). The payments in subdivision (b)(ii) shall be determined in accordance with subdivision (d) below and shall be based on the Net Win generated during the immediately preceding quarter. If the Gaming Activities authorized by this Amended Compact commence during a calendar quarter, the first payment shall be due on the thirtieth (30th) day following the end of the first full quarter of the Gaming Operation and shall cover the period from the commencement of the Gaming Activities to the end of the first full calendar quarter. The quarterly payments shall be accompanied by the certification specified in subdivision (g).

(d)     (i)  For purposes of subdivision (b)(ii), the Net Win generated from the operation of all additional Gaming Devices over the existing 2,000 Gaming Devices shall be calculated by multiplying the average Net Win per Gaming Device for the quarter by the average number of Gaming Devices operated during that quarter in excess of 2,000.

        (ii)  The average Net Win per Gaming Device is the total Net Win for the quarter divided by the average number of Gaming Devices present on the floors of the Tribe's Gaming Facilities during that quarter.

        (iii)  In turn, the average number of Gaming Devices for the quarter shall be determined by aggregating each day's total number of Gaming Devices present on the floors of the Tribe's Gaming Facilities for each day that the Gaming Facilities are open to the public during that quarter and dividing that total by the number of days in the quarter that the Gaming Facilities are open.

(e)     "Net Win" means the gross revenue from Class III Gaming Devices ("drop") less all prizes and payouts that are directly related to the amount wagered, fills, hopper adjustments, and "participation fees" as defined herein. "Participation fees" is defined as payments made to Gaming Resource Suppliers on a periodic basis by the Tribe's Gaming Operation for the right to lease or otherwise license for play Class III Gaming Devices that the Tribe does not own and that are not generally available for outright purchase by gaming operators.

(f)     "Gaming Device," as defined in Section 2.6 of the Amended Compact, includes, but is not limited to, video poker, but does not include electronic, computer, or other technological aids that qualify as class II gaming (as defined under IGRA). For purposes of calculating the

4

number of Gaming Devices, each player station, terminal or other device
on which a game is played constitutes a separate Gaming Device,
irrespective of whether it is part of an interconnected system of such
terminals, stations or devices.  For purposes of Sections 3.2(b)(ii),
4.3.1(b)(ii), 4.3.1(d), 4.3.1(e), and 4.3.1(f) of this Amended compact, if a
Gaming Device is taken out of play during a day for repairs or otherwise,
and is replaced by another Gaming Device for all or a portion of the
remainder of that day, those two (2) Gaming Devices shall be deemed
one (1) Gaming Device for that day.

(g)     The quarterly payments made pursuant to subdivision (c) shall be
accompanied by a certification of the Net Win calculation prepared by
the chief financial officer of the Gaming Operation or other duly
authorized representative of the Tribe.  The State Gaming Agency may
audit the Net Win calculation and, if it determines that the Net Win is
understated, will promptly notify the Tribe and provide a copy of the
audit.  The Tribe, within thirty (30) calendar days, will either accept the
difference or provide a reconciliation satisfactory to the State Gaming
Agency.  If the Tribe either accepts the difference or does not provide a
reconciliation satisfactory to the State Gaming Agency, the Tribe must
immediately pay the amount of the resulting deficiency plus accrued
interest thereon at the rate of one percent (1.0%) per month or the
maximum rate permitted by state law for delinquent payments owed to
the State, whichever is less.  If the Tribe does not provide a reconciliation
satisfactory to the State Gaming Agency, the Tribe, once payment is
made, may commence dispute resolution under Amended Compact
Section 9.0.  The parties hereto expressly acknowledge that the
certifications and information related to payments herein are subject to
the confidentiality protections and assurances of subdivision (c) of
Amended Compact Section 7.4.3.

(h)     Notwithstanding anything to the contrary in Amended Compact
Section 9.0, any failure of the Tribe to remit its payments pursuant to
subdivisions (b), (c), (d), (e), (f), or (g) will entitle the State to
immediately seek injunctive relief in federal court, or, if the federal court
declines to hear the action, in any state court of competent jurisdiction, to
compel the payments, plus accrued interest thereon at the rate of  one
percent (1.0%) per month or the maximum rate permitted by state law for
delinquent payments owed to the State, whichever is less; and further, the
Tribe hereby expressly consents to be sued in either court, including any

5

related courts of appeal, and waives its right to assert sovereign immunity against the State in any such proceeding to enforce the payment obligations.  Failure to make timely payment shall be deemed a material breach of this Amended Compact.

(i)     If any portion of the fee payments under subdivision (b) herein is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure of at least fifteen (15) business days, and if more than sixty (60) calendar days have passed from the due date, then the Tribe shall cease operating all of its Gaming Devices until full payment is made.

(j)     Notwithstanding the repeal of Sections 5.0, 5.1, 5.2, and 5.3 of the 1999 Compact, nothing herein shall be construed to: (1) discharge any contribution obligations of the Tribe under Sections 5.1 and 5.3 of the 1999 Compact based on the Tribe's gaming revenue received prior to the effective date of this Amended Compact; or (2) preclude the State from conducting audits pursuant to Section 5.3 of the 1999 Compact for any contributions made by the Tribe to the Special Distribution Fund pursuant to the 1999 Compact.

(k)     This Section constitutes a "Section 4.3.1." within the meaning of article 6.5 (commencing with section 63048.6) of Chapter 2 of Division 1 of Title 6.7 of the California Government Code.

(l)     If it is determined that there is an insufficient amount in the Indian Gaming Revenue Sharing Trust Fund in a fiscal year to distribute the quarterly payments pursuant to Government Code Section 12012.90 to each eligible recipient Indian tribe, then the State Gaming Agency shall direct a portion of the revenue contribution in Section 4.3.1(b)(i) to increase the revenue contribution to the Indian Gaming Revenue Sharing Trust Fund in Section 4.3.2.2 in an amount sufficient to ensure the Indian Gaming Revenue Sharing Trust Fund has sufficient resources for each eligible recipient Indian tribe to receive quarterly payments pursuant to Government Code Section 12012.90.

C.    **Section 4.3.2.2** is repealed and replaced by the following:

**Section 4.3.2.2.**  The Tribe shall maintain its existing licenses to operate Gaming Devices by paying to the State Gaming Agency for deposit into the

6

Revenue Sharing Trust Fund an annual fee of two million dollars ($2,000,000.00), to be paid in quarterly payments of five hundred thousand dollars ($500,000.00) each within thirty (30) days of the end of each calendar quarter.  If this Amendment becomes effective during a calendar quarter, payment shall be prorated for the number of days remaining in that quarter.

**D.**     A new **Section 4.3.4** is added as follows:

**Section 4.3.4.**  For purposes of Sections 4.3.1 and 4.3.2.2 of this Amended Compact, the State Gaming Agency shall be the California Gambling Control Commission, unless the State provides otherwise by written notice pursuant to Section 13.0.

## III.   *AUTHORIZATION AND EXCLUSIVITY*

**A.**     **Section 12.4** is repealed.

**B.**     **Section 3.0** is repealed and replaced with the following:

**Section 3.0.**  Authorization and Exclusivity of Class III Gaming.

**C.**     A new **Section 3.1** is added as follows:

**Section 3.1.**  The Tribe is hereby authorized and permitted to engage in only the Gaming Activities expressly referred to in Section 4.1 and shall not engage in Class III gaming that is not expressly authorized in that Section.

**D.**     A new **Section 3.2** is added as follows

**Section 3.2.**

(a)     (i)     In the event the State authorizes any person or entity other than an Indian tribe with a federally approved Class III gaming compact to engage in the Gaming Activities specified in subdivision (a) of Section 4.1 of this Amended Compact within the Tribe's core geographic market, which for purposes of this subdivision (a)(i) consists of that geographic area that is within San Bernardino, Riverside, Orange, and Los Angeles Counties, and such person or entity engages in the Gaming Activities specified in subdivision (a) of Section 4.1 of this Amended Compact

7

within the Tribe's core geographic market as specified in this subdivision (a)(i), the Tribe shall have the right to: (A) terminate this Amended Compact, in which case the Tribe will lose the right to engage in Gaming Activities, or (B) continue under this Amended Compact, in which case the Tribe shall be relieved of its obligations to make payments to the State specified in Sections 4.3.1, subdivision (b) and 4.3.2.2, except as set forth in subdivision (b) below, until such time that the Gaming Activities by such person or entity within the Tribe's core geographic market cease.

(ii)  In the event the State authorizes any person or entity other than an Indian tribe with a federally approved Class III gaming compact to engage in the Gaming Activities specified in subdivision (b) of Section 4.1 of this Amended Compact within the Tribe's core geographic market, which for purposes of this subdivision (a)(ii) consists of that geographic area that is within a 100-mile radius of the Tribe's Gaming Facility, and such person or entity engages in the Gaming Activities specified in subdivision (b) of Section 4.1 of this Amended Compact, with twenty-five (25) or more tables at which any kind of card game is played, at any one location within the Tribe's core geographic market as specified in this subdivision (a)(ii), the Tribe shall have the right to: (A) terminate this Amended Compact, in which case the Tribe will lose the right to engage in Gaming Activities, or (B) continue under this Amended Compact, in which case the Tribe shall be relieved of its obligations to make payments to the State specified in Sections 4.3.1, subdivision (b) and 4.3.2.2, except as set forth in subdivision (b) below, until such time that the Gaming Activities by such person or entity within the Tribe's core geographic market cease.

(b)    (i)  Notwithstanding the Tribe's cessation of payments under subdivision (a), if the Tribe operates no more than 2,000 Gaming Devices throughout any calendar year, it shall nonetheless compensate the State for the actual and reasonable costs of regulation, as determined by the State Director of Finance, or failing agreement on that amount, as determined by arbitration pursuant to Section 9.2 of this Amended Compact.

(ii)  Notwithstanding the Tribe's cessation of payments under subdivision (a), if the Tribe operates more than 2,000 Gaming Devices, it shall nonetheless pay twelve and one-half percent (12.5%) of the Net Win attributable to all Gaming Devices above 2,000 in quarterly

8

payments in accordance with subdivisions (c), (d), (e), (f), and (g) of Section 4.3.1, but in no event shall the Tribe pay less than the actual and reasonable costs of regulation, as determined in subdivision (b)(i), if that amount is greater.

(iii)  For purposes of subdivision (b)(ii), the Net Win generated from the operation of all additional Gaming Devices over the existing 2,000 Gaming Devices shall be calculated by multiplying the average Net Win per Gaming Device for the quarter by the average number of Gaming Devices operated during that quarter in excess of 2,000.  The average Net Win per Gaming Device is the total Net Win for the quarter divided by the average number of Gaming Devices present on the floors of the Tribe's Gaming Facilities during that quarter.  In turn, the average number of Gaming Devices for the quarter shall be determined by aggregating each day's total number of Gaming Devices present on the floors of the Tribe's Gaming Facilities for each day that the Gaming Facilities are open to the public during that quarter and dividing that total by the number of days in the quarter that the Gaming Facilities are open.

(c)    Nothing herein shall relieve the Tribe of any obligations it may have pursuant to any intergovernmental agreement entered into pursuant to Sections 10.8.8 or 10.8.9.

(d)    Nothing herein precludes the State Lottery from offering any lottery games or devices that are authorized by the California Constitution as it exists as of July 1, 2006.

**IV.    *TESTING OF GAMING DEVICES***

**A.**    The following new **Section 7.5** is added as follows:

**Section 7.5.**  Testing of Gaming Devices.

(a)    No Gaming Device may be offered for play unless:

(i)    The manufacturer or distributor which sells, leases, or distributes such Gaming Device (A) has applied for a determination of suitability by the State Gaming Agency at least fifteen (15) days before it is offered for play, (B) has not been found to be unsuitable by the State Gaming

9

Agency, and (C) has been licensed by the Tribal Gaming Agency; and

(ii) The software for the game authorized for play on the Gaming Device has been tested, approved and certified by an independent or state governmental gaming test laboratory (the "Gaming Test Laboratory") as operating in accordance with either the standards of Gaming Laboratories International, Inc. known as GLI-11 and GLI-12, or the technical standards approved by the State of Nevada, or such other technical standards as the State Gaming Agency and the Tribal Gaming Agency shall agree upon, which agreement shall not be unreasonably withheld, and a copy of the certification is provided to the State Gaming Agency by electronic transmission or by mail unless the State Gaming Agency waives in writing receipt of copies of certification; and

(iii) The software for the game authorized for play on the Gaming Device is tested by the Tribal Gaming Agency to ensure that each game authorized for play on the Gaming Device has the correct electronic signature prior to insertion into the Gaming Device; and

(iv) The hardware and associated equipment for each type of Gaming Device has been tested by the Gaming Test Laboratory to ensure operation in accordance with the manufacturer's specifications.

(v) The hardware and associated equipment for each Gaming Device has been tested by the Tribal Gaming Agency to ensure operation in accordance with the manufacturer's specifications.

(b) The Gaming Test Laboratory shall be an independent or state governmental gaming test laboratory recognized in the gaming industry which (i) is competent and qualified to conduct scientific tests and evaluations of Gaming Devices, and (ii) is licensed or approved by any of the following states: Arizona, California, Colorado, Illinois, Indiana, Iowa, Michigan, Missouri, Nevada, New Jersey, or Wisconsin. The Tribal Gaming Agency shall submit to

10

the State Gaming Agency documentation that demonstrates the Gaming Test Laboratory satisfies (i) and (ii) herein within thirty (30) days of the effective date of this Amended Compact, or if such use follows the effective date, within fifteen (15) days prior to reliance thereon. If, at any time, the Gaming Test Laboratory license and/or approval required by (ii) herein is suspended or revoked by any of those states or the Gaming Test Laboratory is found unsuitable by the State Gaming Agency, then the State Gaming Agency may reject the use of the Gaming Test Laboratory, and upon such rejection, the Tribal Gaming Agency shall ensure that the Gaming Test Laboratory discontinues its responsibilities under this Section.

(c)     The State Gaming Agency may inspect the Gaming Devices in operation at a Gaming Facility on a random basis four (4) times annually to confirm that they operate and play properly pursuant to the manufacturer's technical standards. During each random inspection, the State Gaming Agency shall inspect no more than five percent (5%) of the Gaming Devices in operation at the Gaming Facility and shall not remove a Gaming Device from service, except during inspection or testing, or from the Gaming Facility at any time, unless it obtains the concurrence of the Tribal Gaming Agency, which shall not be unreasonably withheld. The random inspections conducted pursuant to this subdivision shall occur during normal business hours from 7 a.m. to 5 p.m. outside of Fridays, weekends, and holidays. The State Gaming Agency shall provide notice to the Tribal Gaming Agency of such inspection prior to the commencement of the random inspection, and the Tribal Gaming Agency may accompany the State Gaming Agency inspector(s) during the inspection of the Gaming Devices. The State Gaming Agency may conduct additional inspections only upon reasonable belief of any irregularity and after informing the Tribal Gaming Agency of the basis for such belief.

(d)     The State Gaming Agency may review at a Gaming Facility during normal business hours the Tribe's technical standards, regulations and internal controls applicable to the Tribe's Gaming Devices. The Tribal Gaming Agency shall notify the State Gaming Agency of, and make available for review by the State Gaming Agency, any revisions to the Tribe's technical standards, manuals, regulations and/or internal controls for the Tribe's Gaming Devices. The notice shall be made at least thirty (30) days before the effective date of such revisions. Upon request by the State Gaming Agency, the Tribal Gaming Agency shall provide copies of specified portions of the technical standards, manuals, regulations and internal controls to the State Gaming Agency.

11

(e)     For purposes of this Section 7.5, the State Gaming Agency shall be the California Gambling Control Commission, unless the State provides otherwise by written notice pursuant to Section 13.0.

## V.   *BUILDING CODES*

**Subdivision (d) of Section 6.4.2 is repealed and subdivisions (d)-(l) of Section 6.4.2 are added as follows:**

**Section 6.4.2.**

(d)     Subdivision (b) shall apply to any Gaming Facility constructed prior to the effective date of this Amendment, and subdivisions (e) through (l) herein shall apply to the construction of any new Gaming Facility after the effective date of this Amendment and to any reconstruction, alteration of, or addition to, any Gaming Facility occurring after the effective date ("Covered Gaming Facility Construction").

(e)     In order to ensure the protection of the health and safety of all Gaming Facility patrons, guests, and employees, the Tribe shall adopt or has already adopted, and shall maintain throughout the term of this Amended Compact, an ordinance that requires any Covered Gaming Facility Construction to meet or exceed the California Building Code and the Public Safety Code applicable to the city or county in which the Gaming Facility is located as set forth in Titles 19 and 24 of the California Code of Regulations, as those regulations may be amended during the term of this Amended Compact, including but not limited to, codes for building, electrical, energy, mechanical, plumbing, fire, and safety ("the Applicable Codes"). Any Covered Gaming Facility Construction will also comply with the federal Americans with Disabilities Act, P.L. 101-336, as amended, 42 U.S.C. § 12101 et seq. Notwithstanding the foregoing, the Tribe need not comply with any standard that specifically applies in name or in fact only to tribal facilities. Without limiting the rights of the State under this Section, reference to Applicable Codes is not intended to confer jurisdiction upon the State or its political subdivisions.

(f)     In order to assure compliance with the Applicable Codes, in all cases where the Applicable Codes would otherwise require a permit, the Tribe shall require inspections and shall, for that purpose, employ for any Covered Gaming Facility Construction appropriate plan checkers or review firms that either are California licensed architects or engineers with relevant experience or

are on the list, if any, of approved plan checkers or review firms provided by the city or county in which the Gaming Facility is located, and employ project inspectors that have been either certified in compliance with California Health and Safety Code sections 18949.25-18949.31 or approved as Class 1 certified inspectors by the Division of the State Architect or approved as Class A certified inspectors by the Office of Statewide Health Planning and Development or their successors. For purposes of this subdivision, the local agency referenced in California Health and Safety Code sections 18949.25-18949.31 shall be the Tribe. The Tribe shall require the inspectors to maintain contemporaneous records of all inspections and report in writing any failure to comply with the Applicable Codes to the Tribal Gaming Agency and an agency designated by the State (the "State Designated Agency"). The plan checkers, review firms, and project inspectors shall hereafter be referred to as "Inspector(s)."

(g)     In all cases where the Applicable Codes would otherwise require plan check, the Tribe shall require those responsible for any Covered Gaming Facility Construction to maintain for inspection and copying by the State Designated Agency upon its request the documentation set forth below:

> (i)     The design and construction calculations, and plans and specifications that form the basis for the planned Covered Gaming Facility Construction (the "Design and Building Plans");

> (ii)    All contract change orders, and other documents that are related to any material changes to a structural detail of the Design and Building Plans or any other changes in the Design and Building Plans; and

> (iii)   All other contract change orders.

The Tribe shall maintain the Design and Building Plans for the term of this Amended Compact or until expiration of twenty four (24) months following permanent cessation of occupancy of the building to which such plans and other documents apply, whichever first occurs.

(h)     The State Designated Agency may designate an agent or agents to be given reasonable advance notice of each inspection required under subdivision (f), and the State agent(s) may accompany the Inspector on any

13

such inspection.  The Tribe agrees to correct any Gaming Facility condition noted in the inspection that does not meet the Applicable Codes (hereinafter "deficiency").  Upon not fewer than three (3) business days' notice to the Tribal Gaming Agency, except in circumstances posing a serious or significant risk to the health or safety of any persons, in which case no advance notice is required, the State Designated Agency shall also have the right to conduct an independent inspection of the Gaming Facility to verify compliance with the Applicable Codes before public occupancy and shall report to the Tribal Gaming Agency any alleged deficiency; provided, however, that prior to any exercise by the State of its right to inspect without notice based upon alleged circumstances posing a serious or significant threat to the health or safety of any person, the State Designated Agency shall provide to the Tribal Gaming Agency notice in writing specifying in reasonable detail those alleged circumstances.

(i)     Upon final certification by the Inspector that a Gaming Facility meets Applicable Codes, the Tribal Gaming Agency shall forward the Inspector's certification to the State Designated Agency within ten (10) days of issuance.  If the State Designated Agency objects to that certification, the Tribe shall make a good faith effort to address the State Designated Agency's concerns, but if the State Designated Agency does not withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of Section 9.0.

(j)     A Gaming Facility shall be issued a certificate of occupancy by the Tribal Gaming Agency based on the final certification specified in subdivision (i).  The certificate of occupancy shall be reviewed for continuing compliance on a biennial basis.  Inspections by Inspectors (as defined herein) shall be conducted under the direction of the Tribal Gaming Agency as the basis for issuing any biennial renewals of the certificate of occupancy.

(k)     Any failure to remedy within a reasonable period of time any deficiency that poses a serious or significant risk to the health or safety of any person shall be deemed a violation of this Amended Compact and furthermore shall be grounds for the State Designated Agency to seek and obtain a court order to prohibit occupancy of the affected portion of the Gaming Facility until the deficiency is corrected.

(l)     The Tribe shall also take all necessary steps to (i) reasonably ensure the ongoing availability of sufficient and qualified fire suppression services to the Gaming Facility and (ii) reasonably ensure that the Gaming

14

Facility satisfies all requirements of the Tribe's fire codes and the fire codes and regulations applicable to the county and any city in which the Gaming Facility is located. Not more than sixty (60) days after the effective date of this Amendment and not less than thirty (30) days before the commencement of Gaming Activities in any Gaming Facility subject to the Covered Gaming Facility Construction requirements of this Section, and not less than biennially thereafter in both cases, and upon at least ten (10) days' notice to the State Designated Agency, the Gaming Facility shall be inspected, at the Tribe's expense, by a Tribal official, if any, who is responsible for fire protection on the Tribe's lands, or by an independent expert, for purposes of certifying that the Gaming Facility meets a reasonable standard of fire safety and life safety. The State Designated Agency shall be entitled to designate and have a qualified representative or representatives present during the inspection. During such inspection, the State's representative(s) shall specify to the Tribal official or independent expert, as the case may be, any condition which the representative(s) reasonably believes would preclude certification of the Gaming Facility as meeting a reasonable standard of fire safety and life safety. Within fifteen (15) days of the inspection, the Tribal official or independent expert shall issue a report on the inspection, identifying any deficiency in fire safety or life safety at the Gaming Facility or in the ability of the Tribe to meet reasonably expected fire suppression needs of the Gaming Facility. Within fifteen (15) days after the issuance of the report, the Tribal official or independent expert shall also require and approve a specific plan for correcting deficiencies, whether in fire safety at the Gaming Facility or in the Tribe's ability to meet the reasonably expected fire suppression needs of the Gaming Facility, including those identified by the State's representative(s). A copy of the report shall be served on the State Designated Agency, upon delivery of the report to the Tribe. Immediately upon correction of all deficiencies identified in the report, the Tribal official or independent expert shall certify in writing to the State Designated Agency that all previously identified deficiencies have been corrected. Any failure to correct all deficiencies identified in the report within a reasonable period of time may be deemed by the State to be a violation of the Amended Compact, and any failure to promptly correct those deficiencies that pose a serious or significant risk to the health or safety of any occupants shall be a violation of the Compact and grounds for the State Gaming Agency or other State Designated Agency to prohibit occupancy of the affected portion of the Gaming Facility pursuant to a court order until the deficiency is corrected.

## VI.   *PATRON DISPUTES*

**Section 8.1.10(d)** of the 1999 Compact is repealed and replaced by the following:

### Section 8.1.10(d)

(i)     The Tribal Gaming Agency shall promulgate regulations governing patron disputes over the play and the operation of any Gaming Activity, including any refusal to pay a patron any alleged winnings from any Gaming Activities, which regulations must meet the following minimum standards:

(A)     A patron who makes a complaint to personnel of the Gaming Operation over the play or operation of any game within three (3) days of the play or operation shall be advised in writing of his or her right to request, within fifteen (15) days of the date of making the complaint, resolution of the complaint by the Tribal Gaming Agency, and if dissatisfied with that resolution, to timely proceed to a resolution by binding arbitration.

(B)     Upon request by the patron for a resolution of his or her complaint, the Tribal Gaming Agency shall conduct a complete investigation, shall provide to the patron a copy of its regulations concerning patron complaints, and shall render a decision consistent with federal gaming standards. The decision shall be issued within sixty (60) days of the patron's request, shall be in writing, shall be based on the facts surrounding the dispute, and shall set forth the reasons for the decision.

(C)     If the patron is dissatisfied with the decision of the Tribal Gaming Agency, or no decision is issued within the sixty (60) day period, the patron may request that the complaint over  claimed prizes or winnings and the amount thereof, be settled by binding arbitration before a single arbitrator, who shall be a retired judge, in accordance with the streamlined arbitration rules and procedures of JAMS (or if those rules no longer exist, the closest equivalent). The arbitration shall take place within twenty-five (25) miles of the exterior boundaries of the San Manuel Indian Reservation (the "Reservation").  Upon such request, the Tribe shall consent to such

16

arbitration and agree to abide by the decision of the arbitrator;
provided, however, that if any alleged winnings are found to be a
result of a mechanical, electronic or electromechanical failure,
which is not due to the intentional acts or gross negligence of the
Tribe or its agents, the arbitrator shall deny the patron's claim for
the winnings but shall award reimbursement of the amounts
wagered by the patron which were lost as a result of the failure,
unless the arbitrator finds that such failure was the result of the
intentional act or gross negligence of the patron.  To effectuate its
consent to arbitration, the Tribe shall, in the exercise of its
sovereignty, waive its right to assert sovereign immunity in
connection with the arbitrator's jurisdiction and in any action
brought in federal court or, if the federal court declines to hear the
action, in any action brought in the courts of the State of California
that are located in San Bernardino County, including courts of
appeal, to (1) enforce the parties' obligation to arbitrate, (2)
confirm, correct, modify, or vacate the arbitral award rendered in
the arbitration, or (3) enforce or execute a judgment based upon the
award.  The Tribe agrees not to assert, and will waive any defense,
alleging improper venue or forum non conveniens as to such state
courts.  The cost and expenses of such arbitration shall be initially
borne by the Tribe but the arbitrator shall award to the prevailing
party its costs and expenses (but not attorney fees).  Any party
dissatisfied with the award of the arbitrator may at the party's
election invoke the JAMS Optional Arbitration Appeal Procedure
(and if those rules no longer exist, the closest equivalent); provided
that the party making such election must bear all costs and
expenses of JAMS and the arbitrators associated with the Appeal
Procedure regardless of the outcome.

(ii)    At such time that the Tribe establishes a tribal court system, the
Tribe may give notice to the State that it seeks to renegotiate in good
faith this subdivision (d), in which case, the State shall be obligated to
negotiate in good faith the arrangements, if any, by which the tribal court
system will adjudicate patron claims covered under this subdivision.  In
so negotiating, the State shall give due respect to the sovereign rights of
the Tribe, and due consideration to the due process safeguards
established in the tribal court system, the transparency of the tribal court
system, and the appellate rights afforded under the system.

17

## VII.  *PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY*

**A.**     **Sections 10.2 (a), (b), and (c)** of the 1999 Compact are repealed and replaced by the following:

(a)     Adopt and comply with standards no less stringent than state public health standards for food and beverage handling. The Gaming Operation will allow inspection of food and beverage services by state or county health inspectors, during normal hours of operation of the Gaming Facility, to assess compliance with these standards, unless inspections are routinely made by an agency of the United States government to ensure compliance with equivalent standards of the United States Public Health Service.  Any report or writing by any inspector shall be transmitted to the State Gaming Agency and the Tribal Gaming Agency within twenty-four (24) hours of its issuance to the Gaming Operation.  Nothing herein shall be construed as a submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Amended Compact.

(b)     Adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California; the Gaming Operation will allow for inspection and testing of Gaming Facility water quality by state or county health inspectors, as applicable, during normal hours of operation of the Gaming Facility, to assess compliance with these standards, unless inspections and testing are routinely made by an agency of the United States pursuant to, or by the Tribe under express authorization of federal law, to ensure compliance with federal water quality and safe drinking water standards.  Any report or writing by any inspector shall be transmitted to the State Gaming Agency and the Tribal Gaming Agency within twenty-four (24) hours of its issuance to the Gaming Operation.  Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Amended Compact.

(c)     Comply with the building and safety standards set forth in Section 6.4, as amended herein.

18

**B.**     A new **Section 10.2(l)** is added as follows:

(l)     Adopt and comply with standards no less stringent than the standards of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., and the United States Department of Labor regulations implementing the Fair Labor Standards Act (29 CFR § 500, et seq.).

**C.**     **Section 10.2(d)** of the 1999 Compact is repealed and replaced by the following:

**Section 10.2(d)**

(i)     The Tribe shall obtain and maintain a commercial general liability insurance policy consistent with industry standards for non-tribal casinos and underwritten by an insurer with an A.M. Best rating of A or higher ("Policy") which provides coverage of no less than ten million dollars ($10,000,000.00) per occurrence for bodily injury, property damage, and personal injury arising out of, connected with, or relating to the operation of the Gaming Facility or Gaming Activities.  In order to effectuate the insurance coverage, the Tribe shall waive its right to assert sovereign immunity up to the limits of the Policy in accordance with the tribal ordinance referenced in subdivision (d)(ii) below in connection with any claim for bodily injury, property damage, or personal injury arising out of, connected with, or relating to the operation of the Gaming Facility, including, but not limited to, injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility; provided, however, that nothing herein requires the Tribe to agree to liability for punitive damages or to waive its right to assert sovereign immunity in connection therewith.  The Policy shall acknowledge that the Tribe has waived its right to assert sovereign immunity for the purpose of arbitration of those claims up to the limits of the Policy referred to above and for the purpose of enforcement of any ensuing award or judgment and shall include an endorsement providing that the insurer shall not invoke tribal sovereign immunity up to the limits of the Policy; however, such endorsement or acknowledgement shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity beyond the Policy limits.

19

(ii)    The Tribe shall maintain in continuous force its Tort Liability Ordinance which shall, prior to the effective date of this Amendment and at all times hereafter, continuously provide at least the following:

(A)    That California tort law shall govern all claims of bodily injury, property damage, or personal injury arising out of, connected with, or relating to the operation of the Gaming Facility or the Gaming Activities, including, but not limited to, injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility, provided that any and all laws governing punitive damages need not be a part of the Ordinance.

(B)    That the Tribe waives its right to assert sovereign immunity with respect to the arbitration and court review of such claims but only up to the limits of the Policy; provided, however, such waiver shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity beyond the Policy limits.

(C)    That the Tribe consents to binding arbitration before a single arbitrator, who shall be a retired judge, in accordance with the comprehensive arbitration rules and procedures of JAMS (or if those rules no longer exist, the closest equivalent) to the extent of the limits of the Policy, that discovery in the arbitration proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure, that the Tribe shall initially bear the cost of JAMS and the arbitrator, but the arbitrator may award costs to the prevailing party not to exceed those allowable in a suit in California Superior Court, and that any party dissatisfied with the award of the arbitrator may at the party's election invoke the JAMS Optional Arbitration Appeal Procedure (or if those rules no longer exist, the closest equivalent), provided that the party making such election must bear all costs and expenses of JAMS and the arbitrators associated with the Appeal Procedure regardless of the outcome.  To

20

effectuate its consent to the foregoing arbitration procedure, the Tribe shall, in the exercise of its sovereignty, waive its right to assert its sovereign immunity in connection with the arbitrator's jurisdiction and in any action brought in the United States District Court where the Tribe's Gaming Facility is located and the Ninth Circuit Court of Appeals (and any successor court), or, if the federal court declines to hear the action, in any action brought in the courts of the State of California that are located in San Bernardino County, including courts of appeal, to (1) enforce the parties' obligation to arbitrate, (2) confirm, correct, modify, or vacate the arbitral award rendered in the arbitration, or (3) enforce or execute a judgment based upon the award.  The Tribe agrees not to assert, and will waive, any defense alleging improper venue or forum non conveniens as to such state courts.

(D)    The Ordinance may require that the claimant first exhaust the Tribe's administrative remedies, if any, for resolving the claim (hereinafter the "Tribal Dispute Resolution Process") in accordance with the following standards:

(1)    That upon notice that a claimant alleges to have suffered an injury or damage, the Tribe or the Tribal Gaming Agency shall provide notice by personal service or certified mail, return receipt requested, that the claimant is required within 180 calendar days of receipt of the written notice ("limitation period") to proceed with the Tribal Dispute Resolution Process.

(2)    That the claimant must bring his or her claim within 180 days of receipt of the written notice of the Tribal Dispute Resolution Process as long as the notice specified in subdivision (1) has been satisfied.

(3)    That the arbitration may be stayed until the completion of the Tribal Dispute Resolution Process or 180 days from the date the claim was filed,

whichever first occurs, unless the parties mutually agree upon a longer period.

(4)    That the decision of the Tribal Dispute Resolution Process be a reasoned decision, and shall be rendered within 180 days from the date the claim was filed.

(iii)    Upon notice that a claimant claims to have suffered an injury or damage covered by this Section, the Tribe shall provide notice by personal service or certified mail, return receipt requested, that the claimant is required within the specified limitation period to first exhaust the Tribal Dispute Resolution Process, if any, and if dissatisfied with the resolution, is entitled to arbitrate his or her claim before a retired judge.

(iv)    Failure to comply with this Section 10.2, subdivisions (d)(i), (d)(ii), or (d)(iii), shall be deemed a material breach of the Compact.

(v)    At such time that the Tribe establishes a tribal court system, the Tribe may give notice to the State that it seeks to renegotiate in good faith this subdivision (d), in which case, the State shall be obligated to negotiate in good faith the arrangements, if any, by which the tribal court system will adjudicate claims of bodily injury, property damage, or personal injury covered under this subdivision (d). In so negotiating, the State shall give due respect to the sovereign rights of the Tribe, and due consideration to the due process safeguards established in the tribal court system, the transparency of the tribal court system, and the appellate rights afforded under the system.

## VIII. *WORKERS' COMPENSATION*

**Section 10.3(a)** is amended to read as follows:

**Section 10.3.** Participation in state statutory programs related to employment.

22

(a)     In lieu of permitting the Gaming Operation to participate in the state statutory workers' compensation system, the Tribe may create and maintain a system that provides redress for Gaming Facility employees' work-related injuries through requiring insurance or self-insurance, which system must include a scope of coverage, provision of up to ten thousand dollars ($10,000) in medical treatment for alleged injury until the date that liability for the claim is accepted or rejected, employee choice of physician (either after thirty (30) days from the date of the injury is reported or if a medical provider network has been established, within the medical provider network), quality and timely medical treatment provided comparable to the state's medical treatment utilization schedule, availability of an independent medical examination to resolve disagreements on appropriate treatment (by an Independent Medical Reviewer on the state's approved list, a Qualified Medical Evaluator on the state's approved list, or an Agreed Medical Examiner upon mutual agreement of the employer and employee), the right to notice, hearings before an independent tribunal, a means of enforcement against the employer, and benefits (including, but not limited to, disability, rehabilitation and return to work) comparable to those mandated for comparable employees under state law.  Not later than the effective date of this Amended Compact, or sixty (60) days prior to the commencement of Gaming Activities under this Amended Compact, the Tribe will (1) advise the State of its election to participate in the statutory workers' compensation system or, alternatively, (2) forward to the State all relevant ordinances that have been adopted and all other documents establishing the system and demonstrating that the system is fully operational and compliant with the comparability standard set forth above.  The Tribe may, no more than once every two calendar years thereafter, change its election by so notifying the State and providing such demonstration of compliance as required above, and shall allow thirty (30) days to elapse following notification to the State of such election before implementing any change to the system.  The parties agree that independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

## IX.  *MITIGATION OF OFF-RESERVATION IMPACTS*

**Section 10.8** is repealed and replaced by the following:

**Section 10.8.**  Off-Reservation Impact(s).

**Section 10.8.1.**  Tribal Environmental Impact Report.  (a)  Before the commencement of any Project as defined in Section 10.8.7 herein, the Tribe shall prepare a tribal environmental impact report, (hereafter "TEIR"), analyzing the potentially significant off-reservation environmental impacts of the Project pursuant to the process set forth in this Section 10.8; provided, however, that information or data which is relevant to such a TEIR and is a matter of public record or is generally available to the public need not be repeated in its entirety in such TEIR, but may be specifically cited as the source for conclusions stated therein; and provided further that such information or data shall be briefly described, that its relationship to the TEIR shall be indicated, and that the source thereof shall be reasonably available for inspection at a public place or public building.  The TEIR shall provide detailed information about the Significant Effect(s) on the Off-Reservation Environment which the Project is likely to have, including the matters set forth in Exhibit A, shall list ways in which the Significant Effects on the Environment might be minimized, and shall include a detailed statement setting forth all of the following:

    (i)    All Significant Effects on the Off-Reservation Environment of the proposed Project;

    (ii)    In a separate section:

        (A)    Any Significant Effect on the Off-Reservation Environment that cannot be avoided if the Project is implemented;

        (B)    Any Significant Effect on the Off-Reservation Environment that would be irreversible if the Project is implemented;

    (iii)    Mitigation measures proposed to minimize Significant Effects on the Off-Reservation Environment, including, but not limited to, measures to reduce the wasteful, inefficient, or unnecessary consumption of energy;

    (iv)    Whether any proposed mitigation is feasible;

24

(v)     Alternatives to the Project; provided that the Tribe need not address alternatives that would require it to forgo its right to engage in the Gaming Activities authorized by this Amended Compact on its Indian lands;

(vi)    Any direct growth-inducing impacts of the Project; and

(vii)   Whether the proposed mitigation would be effective to substantially reduce the potential Significant Effects on the Off-Reservation Environment.

(b)     In addition to the information required pursuant to subdivision (a), the TEIR shall also contain a statement briefly indicating the reasons for determining that various effects of the Project on the off-reservation environment are not significant and consequently have not been discussed in detail in the TEIR. In the TEIR, the direct and indirect Significant Effects on the Off-Reservation Environment, including each of the items on Exhibit A, shall be clearly identified and described, giving due consideration to both the short-term and long-term effects. The discussion of mitigation measures shall describe feasible measures which could minimize significant adverse effects, and shall distinguish between the measures that are proposed by the Tribe and other measures proposed by others. Where several measures are available to mitigate an effect, each should be discussed and the basis for selecting a particular measure should be identified. Formulation of mitigation measures should not be deferred until some future time. The TEIR shall also describe a range of reasonable Project alternatives, which would feasibly attain most of the objectives of the Project and which would avoid or substantially lessen any of the Significant Effects on the Off-Reservation Environment, and evaluate the comparative merits of the alternatives; provided that the Tribe need not address alternatives that would cause it to forgo its right to engage in the Gaming Activities authorized by this Amended Compact on its Indian lands. The TEIR must include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison. The TEIR shall also contain an index or table of contents and a summary, which shall identify each Significant Effect on the Off-Reservation Environment with proposed mitigation measures and alternatives that would reduce or avoid that effect, and issues to be resolved, including the choice among alternatives and whether and how to mitigate the Significant Effects on the Environment. Previously approved land use documents, including, but not limited to, general plans, specific plans, and local coastal plans, may be used to discuss cumulative impact analysis.

25

**Section 10.8.2.** Notice of Preparation of Draft TEIR.

(a)   Upon commencing the preparation of the draft TEIR, the Tribe shall issue a Notice of Preparation to the State Clearinghouse in the State Office of Planning and Research ("State Clearinghouse"), to the County of San Bernardino, to the public and to other Interested Persons, Agencies and cities. The Notice shall provide all Interested Persons with information describing the Project and its potential Significant Effects on the Environment sufficient to enable Interested Persons to make a meaningful response or comment.  At a minimum, the Notice shall include all of the following information:

(i)   A description of the Project;

(ii)   The location of the Project shown on a detailed map, preferably topographical, and on a regional map; and

(iii)   The probable off-reservation environmental effects of the Project.

(b)   The Notice shall also inform Interested Persons of the opportunity to provide comments to the Tribe within thirty (30) days of the date of receipt of the Notice by the State Clearinghouse and the County.  The Notice shall also request Interested Persons to identify in their comments the off-reservation environmental issues and reasonable mitigation measures that the Tribe will need to have explored in the draft TEIR.

**Section 10.8.3.** Notice of Completion of the Draft TEIR.

(a)   Within no less than thirty (30) days following receipt of the Notice of Preparation by the State Clearinghouse and the County, the Tribe shall file a copy of the draft TEIR and a Notice of Completion with the State Clearinghouse, the County, the local city (if any) within which the Project is located, and the California Department of Justice.  The Notice of Completion shall include all of the following information:

(i)   A brief description of the Project;

(ii)   The proposed location of the Project;

26

    (iii)    An address where copies of the draft TEIR are available; and

    (iv)    Notice of a period of forty-five (45) days during which the Tribe may receive comments on the draft TEIR.

    (b)    The Tribe will submit forty-five (45) copies of the draft TEIR and Notice of Completion to the County, which will be asked to serve in a timely manner the Notice of Completion to all Interested Persons and asked to post public notice of the draft TEIR at the Office of the County Board of Supervisors and to furnish the public notice at the public libraries serving the County.  In addition, the Tribe will provide public notice by at least one of the procedures below:

    (i)    Publication of the Notice of Completion at least one time by the Tribe in a newspaper of general circulation in the area affected by the Project.  If more than one area is affected, the notice shall be published in the newspaper of largest circulation from among the newspapers of general circulation in those areas; or

    (ii)    Direct mailing by the Tribe of the Notice of Completion to the owners and occupants of property adjacent to, but outside, the Indian lands on which the Project is to be located.  Owners of such property shall be identified as shown on the latest equalization assessment roll.

**Section 10.8.4.** Issuance of Final TEIR.  The Tribe shall prepare, certify and make available to the County and the local city (if any) within which the Project is located, a Final TEIR, which shall consist of:

    (i)    The draft TEIR or a revision of the draft;

    (ii)    Comments and recommendations received on the draft TEIR either verbatim or in summary;

    (iii)    A list of persons, organizations, and public agencies commenting on the draft TEIR;

    (iv)    The responses of the Tribe to significant environmental points raised in the review and consultation process; and

(v)     Any other relevant comments and information added by the Tribe.

**Section 10.8.5.**     The Tribe shall reimburse the County for copying and mailing costs resulting from making the Notice of Preparation, Notice of Completion, and Draft TEIR available to the public under this Section 10.8.

**Section 10.8.6.** The Tribe's failure to prepare a TEIR when required may warrant an injunction where appropriate.

**Section 10.8.7**. Definitions.  For purposes of this Section 10.8, the following terms shall be defined as set forth in this Section 10.8.7.

(a)     "Project" is defined as any activity occurring on Indian lands, a principal purpose of which is to serve the Tribe's Gaming Activities or Gaming Operation and which may cause either a direct physical change in the off-reservation environment, or a reasonably foreseeable indirect physical change in the off-reservation environment.  This definition shall be understood to include, but not be limited to, the construction or planned expansion of any Gaming Facility and any construction or planned expansion, a principal purpose of which is to serve a Gaming Facility, including, but not limited to, access roads, parking lots, a hotel, an entertainment facility, utility or waste disposal systems, or water supply, as long as such construction or expansion causes a direct or indirect physical change in the off-reservation environment.

(b)     "Significant Effect(s) on the Environment" is the same as "Significant Effect(s) on the Off-Reservation Environment" and occur(s) if any of the following conditions exist:

(i)     A proposed Project has the potential to degrade the quality of the off-reservation environment, reduce the off-reservation habitat of a fish or wildlife species, cause a fish or wildlife population to drop below self-sustaining levels, eliminate an off-reservation plant or animal community, reduce the number or restrict the range of an endangered, rare or threatened species, or eliminate important examples of the major periods of California history or prehistory, or to achieve short-term, to the disadvantage of long-term, environmental goals.

28

(ii)   The possible effects on the off-reservation environment of a Project are individually limited but cumulatively considerable.  As used herein, "cumulatively considerable" means that the incremental effects of an individual Project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effect of probable future projects.

(iii)  The off-reservation environmental effects of a Project will cause substantial adverse effects on human beings, either directly or indirectly.

For purposes of this definition, reservation refers to Indian lands within the meaning of IGRA.

(c)   "Interested Persons" means (i) all local, State, and federal agencies, which, if a Project were not taking place on Indian lands, would have responsibility for approving the Project or would exercise authority over the natural resources that may be affected by the Project, (ii) Any city with a nexus to the Project, and (iii) any other persons, groups, or agencies that request in writing a notice of preparation of a draft TEIR or have commented on the Project in writing to the Tribe or the County.

Section 10.8.8.  Intergovernmental Agreement.  Before commencement of a Project and no later than when the Tribe issues its Final TEIR, the Tribe shall offer to begin negotiations with the County and any impacted City in which the Gaming Facility is located or adjacent to, (hereafter "Impacted City"), and upon the County's and/or any Impacted City's acceptance of the Tribe's offers, shall negotiate with the County and any Impacted City and shall enter into enforceable written agreements with the County and any Impacted City which include all of the following:

(i)   Provisions providing for the timely mitigation of any Significant Effect on the Off-Reservation Environment (which effects may include, but are not limited to, adverse changes in aesthetics, agricultural resources, air quality, biological resources, cultural resources, geology and soils, hazards and hazardous materials, water resources, land use, mineral resources, traffic, noise, utilities and service systems, and cumulative effects), where such effect is

29

attributable, in whole or in part, to the Project, unless the parties agree that the particular mitigation is infeasible, taking into account economic, environmental, social, technological, and/or other considerations.

(ii)     Provisions relating to reasonable compensation for law enforcement, fire protection, emergency medical services and any other public services to be provided by the County and any Impacted City to the Tribe for the purposes of the Tribe's Gaming Operation as a consequence of the Project.

(iii)    Provisions providing for mitigation of any effect on public safety attributable to the Project, including any reasonable compensation to the County and any Impacted City as a consequence thereof.

(iv)    Provisions providing for reasonable compensation for programs designed to address gambling addiction.

**Section 10.8.9.  Dispute Resolution Process**

(a)  In order to foster good government-to-government relationships and to assure that the Tribe is not unreasonably prevented from commencing a Project and benefiting therefrom, if an agreement with the County and any Impacted City, if any, is not entered into within fifty-five (55) days of the submission of the Final TEIR, or such further time as the Tribe or the County or Impacted City (for the purposes of this Section "the parties") may mutually agree in writing, any party may demand binding arbitration before a single arbitrator pursuant to the comprehensive arbitration rules and procedures of JAMS (or if those rules no longer exist, the closest equivalent) with respect to disputes over mitigation or compensation on which the parties cannot reach agreement.  Upon mutual agreement of the parties, the arbitration may be before a panel of three arbitrators.  Any party dissatisfied with the award of the arbitrator may at the party's election invoke the JAMS Optional Arbitration Appeal Procedure (and if those rules no longer exist, the closest equivalent); provided that the party making such election must bear all costs and expenses of JAMS and the arbitrators associated with the Appeal Procedure regardless of the outcome.

30

(b)  With respect to each dispute specified in subdivision (a), the arbitrator shall issue an award that provides for feasible mitigation of Significant Effects on the Off-Reservation Environment and on public safety and which reasonably compensates for public services pursuant to Section 10.8.8, without unduly interfering with the principal objectives of the Project or imposing environmental mitigation measures which are different in nature or scale from the type of measures that have been required to mitigate impacts of a similar scale of other projects in the surrounding area, to the extent there are such other projects.  The arbitrator shall take into consideration whether the final TEIR provides the data and information necessary to enable the County to determine both whether the Project may result in a Significant Effect on the Off-Reservation Environment and whether the proposed measures in mitigation are sufficient to mitigate any such effect.  The arbitrator may require the parties to produce evidence in support of or in opposition to any factual matter deemed by the arbitrator to be relevant and material to the determination of the dispute. If any party does not participate in the arbitration, the arbitrator shall nonetheless conduct the arbitration and issue an award, and the participating party or parties shall submit such evidence as the arbitrator may require therefor.  The award shall be deemed part of the Intergovernmental Agreement provided for under Section 10.8.8, and upon request of either party, the arbitrator may include those mitigation and compensation measures upon which the parties have agreed in the award.  To effectuate its consent to the foregoing arbitration procedure, the Tribe shall, in the exercise of its sovereignty, waive its right to assert its sovereign immunity in connection with the arbitrator's jurisdiction and in any action brought in the United States District Court where the Tribe's Gaming Facility is located and the Ninth Circuit Court of Appeals (and any successor court), or, if the federal court declines to hear the action, in any action brought in the courts of the State of California that are located in San Bernardino County, including courts of appeal, to (1) enforce the parties' obligation to arbitrate, (2) confirm, correct, modify, or vacate the arbitral award rendered in the arbitration, or (3) enforce or execute a judgment based upon the award.  The Tribe agrees not to assert, and will waive, any defense alleging improper venue or forum non conveniens as to such state courts.

## X.   *LICENSURE OF FINANCIAL SOURCES*

**Section 6.4.6 is repealed and replaced by the following:**

**Section 6.4.6.  Financial Sources.**

    (a)   Subject to subdivision (e) of this Section 6.4.6, any person or entity extending financing, directly or indirectly, to the Tribe for a Gaming Facility or a Gaming Operation (a "Financial Source") shall be licensed by the Tribal Gaming Agency prior to extending that financing.

    (b)   A license issued under this Section shall be reviewed at least every two (2) years for continuing compliance.  In connection with such a review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the previous application.  For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal.

    (c)   Any agreement between the Tribe and a Financial Source shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination, upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.  The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of financing with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal.

    (d)   A Gaming Resource Supplier who provides financing exclusively in connection with the provision, sale, or lease of Gaming Resources obtained from that Supplier may be licensed solely in accordance with licensing procedures applicable, if at all, to Gaming Resource Suppliers, and need not be separately licensed as a Financial Source under this Section.

    (e)   (i)  The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this Section, the following Financial Sources under the circumstances stated.

        (A)   A federally-regulated or state-regulated bank, savings and loan association, or other federally- or state-regulated lending institution.

32

(B)     An entity identified by Uniform Tribal Gaming Regulation CGCC-2, subdivision (f) (as in effect on July 1, 2006) of the California Gambling Control Commission, when that entity is a Financial Source solely by reason of being (1) a purchaser or a holder of debt securities issued directly or indirectly by the Tribe for a Gaming Facility or by the Gaming Operation or (2) the owner of a participation interest in any amount of indebtedness for which a Financial Source described in subdivision (e)(i)(A) is the creditor.

(C)     An investor who, alone or together with any person controlling, controlled by or under common control with such investor, holds less than 10% of all outstanding debt securities issued directly or indirectly by the Tribe for a Gaming Facility or by the Gaming Operation.

(D)     An agency of the federal, state or local government providing financing, together with any person purchasing any debt securities of the agency to provide such financing.

(ii)     The following are not Financial Sources for purposes of this Section.

(A)     An entity identified by Uniform Tribal Gaming Regulation CGCC-2, subdivision (h) (as in effect on July 1, 2006) of the California Gambling Control Commission.

(B)     A person or entity whose sole connection with a provision or extension of financing to the Tribe is to provide loan brokerage or debt servicing for a Financial Source at no cost to the Tribe or the Gaming Operation, provided that no portion of any financing provided is an extension of credit to the Tribe or the Gaming Operation by that person or entity.

(C)     The holder of any Letter-of-Credit-Backed Bonds identified in Uniform Tribal Gaming Regulation CGCC-1 (as in effect on July 1, 2006), so long as the criteria set forth in Uniform Tribal Gaming  Regulations CGCC-1(a)(1) and CGCC-1(a)(2) are met.

(f)     In recognition of changing financial circumstances, this Section shall be subject to good faith renegotiation upon request of either party;

33

provided such renegotiation shall not retroactively affect transactions that have already taken place where the Financial Source has been excluded or exempted from licensing requirements.

## XI.   *EFFECTIVE DATE AND TERM OF COMPACT*

**A.**   **Section 11.1** is amended to read in its entirety as follows:

> **Section 11.1.  Effective Date.**  This Amendment shall not be effective unless and until both of the following have occurred: (a) This Amendment to the 1999 Compact is ratified in accordance with state law; and (b) Notice of approval or constructive approval by the United States Secretary of the Interior is published in the Federal Register as provided in 25 U.S.C. Section 2710(d)(3)(B).

**B.**   **Section 11.2.1(a)** is repealed and replaced by the following:

> **Section 11.2.1(a)**  Once effective, this Amended Compact shall remain in full force and effect until December 31, 2030.  No later than July 1, 2028, the State or the Tribe may request good faith negotiations to extend and modify this Amended Compact or enter into a new compact.  Upon such request by either the State or the Tribe, the parties shall confer promptly and schedule within 30 calendar days of the request a meeting for commencing negotiations.  Nothing in this provision shall preclude the State and the Tribe from engaging in good faith negotiations at any time during the term of this Amended Compact.

**C.**   **Section 11.2.1(b)** is repealed.

## XII.  *NOTICES*

**A.**   **Section 13.0** is amended to read:

**Section 13.0.**  Unless otherwise indicated by this Amended Compact, all notices required or authorized to be served shall be served by first-class mail at the following addresses:

34

Governor                                   Tribal Chairperson
State Capitol                              San Manuel Band of Mission
Sacramento, California 95814              Indians
                                          26569 Community Center Drive
                                          Highland CA 92346

The Tribe or State may change the address to which notices shall be sent by
providing twenty (20) days written notice to the other party.

## XIII. *MISCELLANEOUS*

**A.**     A new **Section 15.7** is hereby added as follows:

    **Section 15.7.** Calculation of time. In computing any period of time
prescribed by this Amended Compact, the day of the event from which the
designated period of time begins to run shall not be included. The last day of
the period so computed shall be included, unless it is a Saturday, a Sunday, or a
legal holiday under the Tribe's laws, State law, or federal law. Unless
otherwise specifically provided herein, the term "days" shall be construed as
calendar days.

**B.**     A new **Section 15.8** is hereby added as follows:

    **Section 15.8.** Whenever the Tribe adopts or amends any ordinance
required to be adopted and/or maintained under the 1999 Compact or this
Amended Compact, the Tribe shall provide a copy of such adopted or amended
ordinance to the Governor's Legal Affairs Secretary within thirty (30) days of
the effective date of such amended ordinance.

**C.**     A new **Section 15.9** is hereby added as follows:

**Section 15.9.** The Tribe expressly represents that, as of the date of the Tribe's
execution of this Amended Compact, the undersigned Chairman has the
authority to execute this Amendment on behalf of the Tribe, including any
waivers of the right to immunity therein, and will provide written proof of such
authority and of the ratification of this Amendment by the tribal governing body
to the Governor no later than thirty (30) days after this Amendment's execution
by the Tribal Chairman. In entering into this Amendment, the State expressly
relies upon the foregoing representations by the Tribe, and the State's entry into
this Amendment is expressly made contingent upon the truth of those

representations.  If the Tribe fails to provide written proof of authority to execute this Amendment or written proof of ratification by the Tribe's governing body within thirty (30) days of the Tribal Chairman's execution of this Amendment, the Governor may declare this Compact null and void by written notice filed with the California Secretary of State within ninety (90) days of the Governor's execution of this Amendment.

The undersigned sign this Amendment on behalf of the State of California and the San Manuel Band of Mission Indians.

STATE OF CALIFORNIA                    San Manuel Band of Mission Indians


_____                _____
By: Arnold Schwarzenegger              By:  Henry Duro
Governor of the State of California    Chairman of the San Manuel Band
                                       of Mission Indians


Executed this 28th day of August,      Executed this 28th day of August,
2006, at Sacramento, California        2006, at Sacramento, California


**ATTEST:**


_____
Bruce McPherson
Secretary of State, State of California

36

# EXHIBIT A

## OFF-RESERVATION ENVIRONMENTAL IMPACT ANALYSIS CHECKLIST

### I.   AESTHETICS

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Have a substantial adverse effect on a scenic vista? | ☐ | ☐ | ☐ | ☐ |
| b) Substantially damage off-reservation scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway? | ☐ | ☐ | ☐ | ☐ |
| c) Create a new source of substantial light or glare, which would adversely affect day or nighttime views of historic buildings or views in the area? | ☐ | ☐ | ☐ | ☐ |

### II.   AGRICULTURAL RESOURCES

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Involve changes in the existing environment, which, due to their location or nature, could result in conversion of off-reservation farmland to non-agricultural use? | ☐ | ☐ | ☐ | ☐ |

### III.   AIR QUALITY

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Conflict with or obstruct implementation of the applicable air quality plan? | ☐ | ☐ | ☐ | ☐ |
| b) Violate any air quality standard or contribute to an existing or projected air quality violation? | ☐ | ☐ | ☐ | ☐ |
| c) Result in a cumulatively considerable net increase of any criteria pollutant for which the project region is non-attainment under an applicable federal or state ambient air | ☐ | ☐ | ☐ | ☐ |

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| quality standard (including releasing emissions, which exceed quantitative thresholds for ozone precursors)? | | | | |
| d) Expose off-reservation sensitive receptors to substantial pollutant concentrations? | ☐ | ☐ | ☐ | ☐ |
| e) Create objectionable odors affecting a substantial number of people off-reservation? | ☐ | ☐ | ☐ | ☐ |

## IV.   BIOLOGICAL RESOURCES

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Have a substantial adverse impact, either directly or through habitat modifications, on any species in local or regional plans, policies, or regulations, or by the California Department of Fish and Game or U.S. Fish and Wildlife Service? | ☐ | ☐ | ☐ | ☐ |
| b) Have a substantial adverse effect on any off-reservation riparian habitat or other sensitive natural community identified in local or regional plans, policies, and regulations or by the California Department of Fish and Game or U.S. Fish and Wildlife Service? | ☐ | ☐ | ☐ | ☐ |
| c) Have a substantial adverse effect on federally protected off-reservation wetlands as defined by Section 404 of the Clean Water Act? | ☐ | ☐ | ☐ | ☐ |
| d) Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites? | ☐ | ☐ | ☐ | ☐ |
| e) Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan? | ☐ | ☐ | ☐ | ☐ |

A-2

## V.   CULTURAL RESOURCES

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Cause a substantial adverse change in the significance of an off-reservation historical or archeological resource? | ☐ | ☐ | ☐ | ☐ |
| b) Directly or indirectly destroy a unique off-reservation paleontological resource or site or unique off-reservation geologic feature? | ☐ | ☐ | ☐ | ☐ |
| c) Disturb any off-reservation human remains, including those interred outside of formal cemeteries? | ☐ | ☐ | ☐ | ☐ |

## VI.   GEOLOGY AND SOILS

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Expose off-reservation people or structures to potential substantial adverse effects, including the risk of loss, injury, or death involving: | | | | |
|    i) Rupture of a known earthquake fault, as delineated on the most recent Alquist-Priolo Earthquake Fault Zoning Map issued by the State Geologist for the area or based on other substantial evidence of a known fault? Refer to Division of Mines and Geology Special Publication 42. | ☐ | ☐ | ☐ | ☐ |
|    ii) Strong seismic ground shaking? | ☐ | ☐ | ☐ | ☐ |
|    iii) Seismic-related ground failure, including liquefaction? | ☐ | ☐ | ☐ | ☐ |
|    iv) Landslides? | ☐ | ☐ | ☐ | ☐ |
| b) Result in substantial off-reservation soil erosion or the loss of topsoil? | ☐ | ☐ | ☐ | ☐ |

## VII.   HAZARDS AND HAZARDOUS MATERIALS

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Create a significant hazard to the off-reservation public or the off-reservation environment through the routine transport, use, or disposal of hazardous materials? | ☐ | ☐ | ☐ | ☐ |

A-3

| | | | | | |
|---|---|---|---|---|---|
| b) | Create a significant hazard to the off-reservation public or the off-reservation environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment? | ☐ | ☐ | ☐ | ☐ |
| c) | Emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within one-quarter mile of an existing or proposed off-reservation school? | ☐ | ☐ | ☐ | ☐ |
| d) | Expose off-reservation people or structures to a significant risk of loss, injury or death involving wildland fires. | ☐ | ☐ | ☐ | ☐ |

## VIII.  WATER RESOURCES

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Violate any water quality standards or waste discharge requirements? | ☐ | ☐ | ☐ | ☐ |
| b) Substantially deplete off-reservation groundwater supplies or interfere substantially with groundwater recharge such that there should be a net deficit in aquifer volume or a lowering of the local groundwater table level (e.g., the production rate of pre-existing nearby wells would drop to a level which would not support existing land uses or planned uses for which permits have been granted)? | ☐ | ☐ | ☐ | ☐ |
| c) Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion of siltation off-site? | ☐ | ☐ | ☐ | ☐ |
| d) Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, or substantially increase the rate or amount of surface runoff in a manner which would result in flooding off-site? | ☐ | ☐ | ☐ | ☐ |
| e) Create or contribute runoff water which would exceed the capacity of existing or planned storm water drainage systems or provide substantial additional sources of polluted runoff off-reservation? | ☐ | ☐ | ☐ | ☐ |
| f) Place within a 100-year flood hazard area structures, which would impede or redirect off-reservation flood flows? | ☐ | ☐ | ☐ | ☐ |
| g) Expose off-reservation people or structures to a significant risk of loss, injury or death involving flooding, including flooding as a result of the failure of a levee or dam? | ☐ | ☐ | ☐ | ☐ |

A-4

## IX.   LAND USE

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Conflict with any off-reservation land use plan, policy, or regulation of an agency adopted for the purpose of avoiding or mitigating an environmental effect? | ☐ | ☐ | ☐ | ☐ |
| b) Conflict with any applicable habitat conservation plan or natural communities conservation plan covering off-reservation lands? | ☐ | ☐ | ☐ | ☐ |

## X.   MINERAL RESOURCES

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Result in the loss of availability of a known off-reservation mineral resource classified MRZ-2 by the State Geologist that would be of value to the region and the residents of the state? | ☐ | ☐ | ☐ | ☐ |
| b) Result in the loss of availability of an off-reservation locally important mineral resource recovery site delineated on a local general plan, specific plan, or other land use plan? | ☐ | ☐ | ☐ | ☐ |

## XI.   NOISE

| Would the project result in: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Exposure of off-reservation persons to noise levels in excess of standards established in the local general plan or noise ordinance, or applicable standards of other agencies? | ☐ | ☐ | ☐ | ☐ |
| b) Exposure of off-reservation persons to excessive groundborne vibration or groundborne noise levels? | ☐ | ☐ | ☐ | ☐ |
| c) A substantial permanent increase in ambient noise levels in the off-reservation vicinity of the project? | ☐ | ☐ | ☐ | ☐ |
| d) A substantial temporary or periodic increase in ambient noise levels in the off-reservation vicinity of the project? | ☐ | ☐ | ☐ | ☐ |

A-5

## XII.   POPULATION AND HOUSING

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Induce substantial off-reservation population growth? | ☐ | ☐ | ☐ | ☐ |
| b)  Displace substantial numbers of existing housing, necessitating the construction of replacement housing elsewhere off-reservation? | ☐ | ☐ | ☐ | ☐ |

## XIII.   PUBLIC SERVICES

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Result in substantial adverse physical impacts associated with the provision of new or physically altered off-reservation governmental facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios, response times, or other performance objectives for any of the off-reservation public services: | | | | |
| Fire protection? | ☐ | ☐ | ☐ | ☐ |
| Police protection? | ☐ | ☐ | ☐ | ☐ |
| Schools? | ☐ | ☐ | ☐ | ☐ |
| Parks? | ☐ | ☐ | ☐ | ☐ |
| Other public facilities? | ☐ | ☐ | ☐ | ☐ |

## XIV.   RECREATION

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Increase the use of existing off-reservation neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated? | ☐ | ☐ | ☐ | ☐ |

A-6

## XV.   TRANSPORTATION / TRAFFIC

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Cause an increase in off-reservation traffic, which is substantial in relation to the existing traffic load and capacity of the street system (i.e., result in a substantial increase in either the number of vehicle trips, the volume-to-capacity ratio on roads, or congestion at intersections)? | ☐ | ☐ | ☐ | ☐ |
| b) Exceed, either individually or cumulatively, a level of service standard established by the county congestion management agency for designated off-reservation roads or highways? | ☐ | ☐ | ☐ | ☐ |
| c) Substantially increase hazards to an off-reservation design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment)? | ☐ | ☐ | ☐ | ☐ |
| d) Result in inadequate emergency access for off-reservation responders? | ☐ | ☐ | ☐ | ☐ |

## XVI.   UTILITIES AND SERVICE SYSTEMS

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Exceed off-reservation wastewater treatment requirements of the applicable Regional Water Quality Control Board? | ☐ | ☐ | ☐ | ☐ |
| b) Require or result in the construction of new water or wastewater treatment facilities or expansion of existing facilities, the construction of which could cause significant off-reservation environmental effects? | ☐ | ☐ | ☐ | ☐ |
| c) Require or result in the construction of new storm water drainage facilities or expansion of existing facilities, the construction of which could cause significant off-reservation environmental effects? | ☐ | ☐ | ☐ | ☐ |
| d) Result in a determination by an off-reservation wastewater treatment provider (if applicable), which serves or may serve the project that it has inadequate capacity to serve the project's projected demand in addition to the provider's existing commitments? | ☐ | ☐ | ☐ | ☐ |

A-7

## XVII.  CUMULATIVE EFFECTS

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Have impacts that are individually limited, but cumulatively considerable off-reservation?  "Cumulatively considerable" means that the incremental effects of a project are considerable when viewed in connection with the effects of past, current, or probable future projects. | ☐ | ☐ | ☐ | ☐ |

A-8